# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

---

ALLIANCE LAUNDRY SYSTEMS, LLC

      Plaintiff,

v.

TRUDY ADAMS, JOHN "CLAY" WILLIAMS,
AUTARKIC HOLDINGS INC. D/B/A
LAUNDRYLUX,

      Defendants.

-------------------------------------------------------------

TRUDY ADAMS, and
JOHN "CLAY" WILLIAMS,

        Counter Plaintiffs/Third Party Plaintiffs,

v.

ALLIANCE LAUNDRY SYSTEMS LLC,

      Counter Defendant,

and

MIKE HAND, SAMANTHA BAKER and
GREG REESE,

        Third-Party Defendants

**CASE NO:**
**3:23-cv-22130 (MCR)**

---

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS/COUNTER-
## PLAINTIFFS/THIRD PARTY-PLAINTIFFS
### MOTION FOR SUMMARY JUDGMENT ON THE PLEADINGS

TABLE OF CONTENTS

INTRODUCTION ……………………………………………….…... 2

PROCEDURAL HISTORY ………………………………………..………… 4

STATEMENT OF FACTS …………………………………………….…... 6

LEGAL STANDARD ……………………………………………….. 13

ARGUMENT ………………………………………………………... 13

I.    The Salespeople are entitled to summary judgment on their
      breach-of-contract counterclaims. ……………..………………13

      1.    Relevant Facts ………………………………………… 14

      2.    The Salespeople performed services for Alliance pursuant to
            valid agreements. ...……………………………………… 16

      3.    Alliance materially breached by not timely paying
            commissions. ……………………………………………….. 18

      4.    Alliance additionally breached the contracts at issue by not
            using the actual costs incurred in calculating the net profit
            margin for each sale. ………………………………………... 19

      5.    The Salespeople have suffered damages caused by Alliance's
            breach. …………………………………………….…… 22

II.   Alliance cannot prove breach of loyalty. …………………..…….. 24

      1.    Alliance has not identified what "confidential
            information" is at issue. ……………………………….….... 24

      2.    Even if the Court were to consider the general categories
            of information Alliance has characterized as confidential,
            most are not confidential as a matter of law, as they are
            commonly known, generally available, or shared without
            restriction. ……………………………………………….. 25

i

3.  The remaining trade secret categories are inapplicable. ..… 30

4.  To the extent Alliance relies on the violation of any
    policy within the Handbook to support the requisite
    element of breach, the claim fails as the Handbook is not
    a binding document and the confidentiality provisions
    contained therein are unintelligible. ……………………… 30

5.  Absent requisite intent, the Salespeople have not
    breached their duty of loyalty to Alliance. ...……………..… 32

6.  Adams was free to use customer lists she developed ….....… 32

7.  Even if the Salespeople used any of the categories of
    information Alliance claims to be confidential
    information, Alliance has no evidence to support
    proximate cause for the damages alleged. …………...…..... 33

8.  In the alternative damages should be limited, and punitive
    damages denied. …………………………………………… 34

**III.   Alliance cannot prove breach of contract.** …………………….. 34

**IV.   Alliance cannot prove its breach-of-contract claim
against Adams** …………………………………………… 36

1.  The Release was unenforceable for lack of
    consideration. …………………………………………… 36

2.  The Release was unenforceable for duress and
    unconscionability. ………………………………………… 37

3.  The Release was procured through fraud. ……………….. 39

CONCLUSION …………………………………………………………… 40

## TABLE OF AUTHORITIES

**Cases**

*Am. Registry, LLC v. Yonah*
2013 U.S. Dist. LEXIS 171889 (M.D. Fla. 2013) ……………………………… 25

*AMS Staff Leasing, Inc. v. Taylor*
158 So. 3d 682, 685 (Fla. 4th DCA 2015) (duress) ……………………………. 37

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242, 248 (1986) ……………………………………………………. 13

*Anich Indus. v. Raney*
751 So. 2d 767, 771 (Fla. 5th DCA 2000) …………………………………… 25

*Beck v. Lazard Freres & Co., LLC*
175 F.3d 913, 914 (11th Cir. 1999) ………………………………………… 13

*Belcher v. Kie*
558 So. 2d 1039 (Fla. 2d DCA 1990) ……………………………………….. 39

*Blackstone v. Dade City Osteopathic Clini*
511 So. 2d 1050 (Fla. 2d DCA 1987) ………………………………………… 26

*Buchanan v. Clinton*
293 So.2d 120, 122 (Fla. Ct. App. 1974) ………………………………...…... 39

*Cassedy v. Alland Investments Corp.*
128 So. 3d 976, 978 (Fla. 1st DCA 2014) .…………………………………… 24

*Centurion Air Cargo, Inc. v. United Parcel Serv. Co.*
420 F.3d 1146, 1151 (11th Cir. 2005) …………………………………………. 18

*CVB, Inc. v. United States*
681 F. Supp. 3d 1314, 1316 (CIT 2024) ……………………………………... 24

*D.L. Peoples Grp., Inc. v. Hawley*
804 So. 2d 561, 562-63 (Fla. Dist. Ct. App. 2002) ……………………..…… 16

*Fish v. Adams*
401 So. 2d 843, 845 (Fla. 5th DCA 1981) ……………………………………… 32

*Florida East Coast Railway Company v. Thompson*
93 Fla. 30, 35, 111 So. 525 (1927) …………………………………………… 40

*Gibson v. Courtois*
539 So. 2d 459, 460 (Fla. 1989) …………………………………………….. 36

*Insurance Field Services, Inc. v. White & White Inspection and Audit Service, Inc*.,
384 So. 2d 303 (Fla. 5th DCA 1980) ……………………………….……… 34

*James River Ins. Co. v. Ultratec Special Effects Inc*.
22 F.4th 1246, 1251 (11th Cir. 2022) ……………………………………….. 13

*Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*
162 F.3d 1290, 1311 (11th Cir. 1998) ……………………………………… 37

*Key v. Allstate Ins. Co*.
90 F.3d 1546, 1549 (11th Cir. 1996) …………………………………...……… 21

*Kolodziej v. Mason*
774 F. 3d 736, 741 (11th Cir. 2014) …………………………………….…… 35

*Koung v. Giordano*
346 So. 3d 108, 114 (Fla. Dist. Ct. App. 2022) ……………………………….. 16

*Leader Glob. Sols., LLC v. Tradeco Infraestructura, S.A. DE C.V.*
155 F. Supp. 3d 1310, 1318 S.D. Fla. 2016) …………………………………… 38

*Lee Cnty. V. Pierpont*
*693 So. 2d 994, 996 (Fla. 2d DCA 1997)* …………………………………… 36

*Leesburg Comm. Cancer Center v. Leesburg Regional Medical Center, Inc.*
972 So. 2d 203, 206 (Fla. 5th DCA 2007) ……………………………….. 15

*Magnus v. Present*
135 So.2d 417, 418 (Fla. 1961)  ……………………….……………………… 37

*Mark Realty, Inc. v. Rogness*
418 So.2d 373, 376 (Fla. App. 5 Dist. 1982) ………………………………….. 16

*NCH Corp. v. Broyles*
749 F.2d 247, 251-252 (5th Cir. 1985) …………………………………………… 24

*Newman v. Consolidated Dispatch Agency*
2017 U.S. Dist. LEXIS 215659 (N.D. Fla. 2017) ………………………....… 34

*Osten v. City of Homestead*
757 So.2d 1243, 1244 (Fla. 3d DCA 2000) …………………………....…… 34

*Posner v. Essex Insurance Co*.
178 F.3d 1209 (11th Cir. 1999) ……………………………………………… 32

*Powertel, Inc. v. Bexley*
743 So. 2d 570, 574 (Fla. 1st DCA 1999) (unconscionability) ……………... 37

*Romano v. Manor Care, Inc*.
861 So. 2d 59, 63-64 (Fla. 4th DCA 2004). …………………………………… 38

*Spungin v. GenSpring Family Offices, LLC*
883 F. Supp. 2d 1193, 1198 (S.D. Fla. 2012) ………………….....…….....… 21

*Templeton v. Creative Loafing Tampa, Inc*.
552 So. 2d 288 (Fla. 2d DCA 1989) …………………………………………… 33

*Thomas v. Fusilie*
966 So. 2d 1001, 1003 (Fla. 5th DCA 2007) ………………………………….. 18

*Tiger Supplies Inc. v. MAV Assocs.  LLC*
2022 U.S. Dist. LEXIS 99435 at *13 (D.N.J. June 3, 2022) …………………… 25

**INTRODUCTION**

Alliance filed this suit to make an example out of former salespeople Trudy Adams and John Clay Williams (collectively, the "Salespeople") and to dissuade others from speaking out about its toxic work culture and anti-competitive practices. During their employment as salespeople with Alliance, Adams and Williams repeatedly raised concerns about the calculation and payment of their commissions, which Alliance refused to address. When Adams obtained proof that Alliance was inflating costs to lower her commissions and complained about this intentional manipulation of her pay, she was summarily fired. Williams resigned shortly thereafter.

After Alliance learned that Adams and Williams had gone to work for Laundrylux, a competing business, Alliance filed this suit against all three parties (collectively, "Defendants"). The Salespeople then filed counterclaims asserting, as relevant here, that Alliance breached their respective employment agreements by, among other things, failing to pay commissions, paying commissions late, and manipulating commission payments to their detriment.

The Salespeople now move for summary judgment on their breach-of-contract counterclaims because they have shown valid agreements requiring the timely payment of commissions; Alliance's breach of those agreements; and damages. There are no material disputes of fact on any of those elements, and the Salespeople

are entitled to judgment as a matter of law.

The Salespeople also move for summary judgment on Alliance's claims for breach of loyalty and breach of contract. Alliance cannot show that the Salespeople breached the duty of loyalty because it cannot identify any specific confidential information at issue and the generally described information that they deem to be confidential is either not at issue or is not confidential as a matter of law. Alliance further cannot support that any claimed breach is the proximate cause of any purported damages suffered. Additionally, Alliance cannot show that the Salespeople breached any contractual agreement because the purported "contract," an employee handbook, is not an enforceable contract as a matter of law.

Adams separately moves for summary judgment on the claim that she purportedly breached the release she was forced to sign after her termination. The release is unenforceable because it lacked consideration, it is invalid under both the defenses of duress and unconscionability and was entered into on a fraudulent basis.

Finally, the Salespeople are entitled to summary judgment on Alliance's trade-secret misappropriation and tortious interference claims for the reasons explained in Laundrylux's motion for summary judgment, which the Salespeople hereby incorporate by reference in its entirety. Briefly stated, Alliance cannot show that any information the Salespeople took was not widely known or readily ascertainable, or that Alliance protected any of the information as trade secrets.

3

Alliance also cannot show interference with any business relationships in which it had existing or prospective legal rights, or that Defendants were doing anything other than competing for business using the same tactics employed by Alliance.

**PROCEDURAL HISTORY**

Alliance filed its Complaint on August 17, 2023 (Dkt. 1).On October 10, 2023, the Salespeople filed their Answer and Affirmative Defenses to Alliance's Complaint, along with breach-of-contract counterclaims against Alliance. Dkt. 11. Adams additionally filed a retaliatory termination counterclaim under the Fair Labor Standards Act ("FLSA") against Alliance and Third-Party Defendants Greg Reese, Mike Hand, and Samantha Baker.

On October 17, 2024, Defendants filed a Joint Motion for Judgment on the Pleadings highlighting Alliance's threadbare, conclusory pleadings and repetitive causes of action, most of which were preempted by Alliance's underlying misappropriation and contract claims.  Dkt. 63. This Court conditionally granted Defendants' Motion for Partial Judgment on the Pleadings on December 3, 2024, notably finding that Alliance failed to allege any facts independent of a contract to support its conversion, civil theft, or breach-of-loyalty claims against Adams and Williams, and stating "at best these claims could be viable only in the alternative to the contract claims." Dkt. 89 at 10. The Court afforded Alliance one opportunity to amend, warning that Alliance's failure to cure any claim in its amended complaint

would result in the Court entering judgment on the pleadings as to that claim. *Id*. at 11-12.

Alliance abandoned its conversion and civil theft claims against Defendants in its Amended Complaint. *See* Dkt. 98. However, against the Court's clear guidance, Alliance maintained its breach-of-loyalty claim against the Salespeople, despite this claim having no factual basis independent of the breach-of-contract claim. *Id*.

Defendants filed their Motion to Dismiss Alliance's Amended Complaint on December 31, 2024. Dkt. 101-1. The Salespeople incorporate herein all arguments raised in the Motion to Dismiss, including that Alliance's misappropriation, tortious interference, and breach-of-loyalty claims must be dismissed because they have no factual basis independent of its breach-of-contract claim. *Id.* at 16-17.

Defendants' Motion to Dismiss currently remains pending before the Court. To comply with the dispositive motion deadline, the Salespeople must seek judgment on claims this Court may render moot. The Salespeople also have not had the opportunity to reallege their counterclaims.

In filing the instant Motion for Summary Judgment, the Salespeople do not abandon their position that Alliance's trade-secret misappropriation claims, breach-of-loyalty claim, and tortious-interference claim should be dismissed with prejudice. The Salespeople expressly reserve all rights to re-allege and amend their respective

counterclaims in response to Alliance's Amended Complaint, in accordance with prevailing authority.

## STATEMENT OF FACTS[1]

This lawsuit concerns the Salespeople's former employment with and mistreatment by Alliance, which continues to this day via Alliance's use of its market power and this baseless lawsuit to target employees who dared to speak out about improperly withheld pay.

Alliance manufactures and sells commercial laundry equipment. Am. Compl. ¶ 9. As the largest player in the industry, Alliance employs more than 4,000 people and operates in about 170 countries through a network of 650 distributors and nine direct offices. *See* Alliance Laundry Systems, https://bit.ly/3D4zvWU (last visited March 6, 2025).

Prior to working for Alliance, Williams enjoyed a near 20-year tenured history within the banking industry. Exhibit 2, Williams Tr. 14:16-17:17. He later became a salesperson with an independent distributor that sold Alliance branded laundry equipment, CLEC, on the recommendation of his long-term friend, Rusty Owens. *Id*. at 48:5-7; 17:23-24. At the time, CLEC was owned by Craig Dakauskas. Exhibit 3, Dakauskas Tr. 22:14-16.

---

[1] Attached as Exhibit 1 is the Declaration of Amaris Gyebi Esq. (Gyebi Decl.) attesting to the nature of the exhibits identified herein.

Alliance ultimately bought the business in 2019, and both Williams and Dakauskas were absorbed into Alliance's corporate structure. Williams Tr. at 23:7-13; Dakauskas Tr. 21:10-11; 24:13-22. Williams remained a sales representative post-purchase, while Dakauskas was put in charge of running the distribution offices Alliance had acquired. Williams Tr. at 23:7-13; Dakauskas Tr. at 25:23-26:8. Later all distribution offices acquired by Alliance were gathered under one umbrella and referenced collectively as "Alliance Distribution". *Id*. at 296:6-9.

Adams has worked in sales for most of her career. Exhibit 4, Adams' Dep. Tr. 14:16-18. Her first major sales position was with a catalog company that sold supplies to the commercial laundry and dry-cleaning industries. *Id*. at 13:15-14:1;17:8-11. Adams moved through the ranks of that company to become the Vice President of Sales. *Id*. at 14:12-15.

Adams learned of a position with Alliance through Craig Dakauskas—as she and Dakauskas both wrote columns for a trade journal. *Id*. at 16:9-12. Adams found the position interesting and chose to accept the job. She began working for CLEC in June 2019, shortly after it was acquired by Alliance. *Id*. at 16:2-4.

Upon being hired, both Adams and Williams were given the job title "Regional Sales Manager." However, at all times, the Salespeople were merely sales representatives for Alliance, occupying essentially the lowest-tiered sales role offered by Alliance. Exhibit 5, Adams' Decl. at ¶6; Exhibit 6, Williams' Decl. at ¶4.

Before being hired, Adams and Williams were verbally told how they would be paid. In exchange for selling Alliance manufactured laundry equipment, their base salary would be $14,400 a year, plus commissions based on sales facilitated on behalf of Alliance. Adams' Decl. at ¶4. Williams' Decl. at ¶5; *see also* Exhibit 7, Stein Dep. Tr. 283:10-284:11. This compensation structure was later reduced to writing and provided to the Salespeople as documents entitled "2018 Compensation Outline" for Williams, and "2019 Compensation Outline" for Adams, reflecting the respective years in which they were hired. *Id.*

New compensation outlines were provided to Adams and Williams on an annual basis. Adams Decl. at ¶5; Williams Decl. at ¶9. The terms of each new compensation outline were largely identical to the last. *See* Exhibits 8[2] and 9. Thus, during his tenure at Alliance, Williams received the: 2018 Compensation Outline, 2019 Compensation Outline, 2020 Compensation Outline, 2021 Compensation Outline, 2022 Compensation Outline, and 2023 Compensation Outline from Alliance (collectively "Williams's Compensation Agreements"). Exhibit 8. Adams similarly received the: 2019 Compensation Outline, 2020 Compensation Outline, 2021 Compensation Outline, 2022 Compensation Outline, and 2023 Compensation Outline from Alliance (collectively "Adams' Compensation Agreements"). Exhibit

---

[2] Williams did not keep copies of the compensation outline received in 2018, 2019, and 2022 and Alliance did not produce the same upon request in discovery.

9.

For the duration of their employment with Alliance, the Salespeople largely worked from their respective homes—Williams, in Dothan Alabama, and Adams in Navarre, Florida. Adams' Decl. at ¶7; Williams' Decl. at ¶10.  While Adams lived closer to the office, she felt more comfortable working from home because of the bigoted treatment she experienced at Alliance. Adams' Decl. at ¶7.

The Salespeople's initial months of employment were marked with difficulty, including poor onboarding and ineffective resources and training. Even though CLEC had operated for at least a decade in the commercial laundry industry, it did not provide the Salespeople with the requisite training, or tools needed to effectively sell the products offered, particularly with respect to locating potential customers. *See e.g.*, Adams Tr. 19:23-25; 20:5-9; 33:19-24; Williams Decl. at ¶¶11-13.

Notwithstanding these hurdles, the Salespeople committed to performing their jobs to the utmost. Adams and Williams proactively sought out potential opportunities, despite Alliance's lack of resources or training, and closed sales on hundreds of thousands of dollars of laundry equipment. Adams Decl. at ¶¶10-12. Williams Decl. at ¶¶17-19.

Adams particularly excelled in her role, surpassing the sales her supervisor, Greg Reese, had made in the territory he previously occupied as the representative salesperson. Adams' Dep. Tr. 23: 14-20. Unfortunately, Adams' success made her

the target of harassment by Reese, who would make disparaging remarks about her and undermined her work. *Id*. at 38:15-41:4.

Throughout her employment, Adams regularly requested assistance from various sources, including Alliance's human resources ("HR") department, to address this continuous harassment. But, as was typical of Alliance culture, her complaints were ignored and, to the extent discussed at all, mocked by upper management and the CEO. *Id*. at 41:5-43:3; *see also* Exhibit 10. In fact, Alliance's CEO, Michael Schoeb, joined in the dismissive and derisive comments at the height of Adams' mistreatment by ████████████████████████████████ ████████████████████ in response to a subsequent complaint—neither of which were ever resolved. *Id*.; *see also* Exhibit 11.

Adams' situation worsened when she discovered discrepancies in her commission calculations. Adams' reports about these discrepancies were dismissed, and she was eventually fired on May 19, 2023, after escalating her concerns. *See* Exhibit 12. Following her termination, Adams joined Laundrylux, a competitor of Alliance, where Alliance has continued its attempts to undermine her success. *See* Exhibit 13; *see also* Exhibit 14, Hand Tr. 134:2-135:15.

In the months following Adams' termination, Williams resigned from Alliance. Williams' Tr. 90:20-21. Like Adams, Williams' complaints regarding being paid untimely and inaccurately were never meaningfully addressed by

Alliance's leadership. Williams was always told that he would have to wait for the next pay period, with everyone disregarding the low pay he received each time Alliance failed to timely pay his commissions. *Id*. at 93:5-94:14; Williams' Decl. at ¶7. While Williams did not know the extent of wage manipulation Alliance was performing during his time with the company, it was not lost upon him that Adams was suddenly no longer with Alliance after raising her complaint. *Id*. at 259:2-10. Upon leaving Alliance, Williams similarly began working for Laundrylux. *Id*. at 90:22-23.

The Salespeople were sadly not alone in being mistreated by Alliance. To the contrary, discovery in this case has revealed a despicable chain of toxicity, harassment, pay manipulation, and a lack of the most basic levels of respect that has unfortunately bonded both former employees *and* customers of Alliance alike:

   a.   <u>Intimidation and bullying</u>. Witnesses have attested to an environment marked by bullying, intimidation tactics, and unethical practices. Exhibit 15, Pollesch Tr. 37:3-19, 44:9-14; Exhibit 16, Yoon Tr. 21:16-26:2, 45:2-20; Exhibit 17, Sabino Tr. 179:24-180:2, 303:5-23, 308:14-309:6. During sales meetings, for example, Alliance managers would play the horse-head scene from The Godfather and warn that most employees would not be around for long. Pollesch 35:13-36:5; Exhibit 18, Schlichting Tr. 13:18-20,

84:22 (company is a sinking ship that went through employees readily).

b.  <u>Sexist behavior</u>. Witnesses have reported sexist behavior, including frequent derogatory comments about women and the termination of female leaders. Pollesch 35:13-36:5; *see also* Exhibit 19.

c.  <u>Wage manipulation</u>. Witnesses have alleged that Alliance unlawfully withheld or unfairly adjusted their compensation, and several former employees have filed lawsuits for unpaid wages. Exhibit 20, Fleck Tr. 75:4-12, 104:8-24; Sabino Tr. 209:19-210:14. One witness described a "Game of Thrones" atmosphere in which employees who missed sales goals were demoted or fired. Fleck Tr. 26:21-27:11. Other evidence shows that when employees complained about wage manipulation, their careers were threatened. *See, e.g.*, Exhibit 21.

This is not merely an action about the alleged trade secret misappropriation. It is a lawsuit brought in bad faith which reflects Alliance's sordid history of scheming and stealing from its employees in the name of lining its pockets, disregarding any concern that does not increase its bottom line, and illegally quelling competition by any means necessary.

**LEGAL STANDARD**

A court must grant summary judgment if a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine" dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). An issue of fact is "material" if it could affect the outcome of the case. *Id*. If the moving party "adequately supports its motion, the burden shifts to the nonmoving party to show that specific facts exist that raise a genuine issue for trial." *James River Ins. Co. v. Ultratec Special Effects Inc*., 22 F.4th 1246, 1251 (11th Cir. 2022). Summary judgment is appropriate when the nonmoving party's "evidence is 'not significantly probative.'" *Id*. (*quoting Anderson*, 477 U.S. at 249-50).

## ARGUMENT

### I.    The Salespeople are entitled to summary judgment on their breach-of-contract counterclaims.

To prevail on a claim for breach of contract, a plaintiff must establish: (1) the existence of a valid contract; (2) a material breach; and (3) damages. *Beck v. Lazard Freres & Co., LLC*, 175 F.3d 913, 914 (11th Cir. 1999). There is no dispute of material fact on any of these elements: Alliance offered, and the Salespeople accepted, valid agreements; Alliance breached those agreements; and the Salespeople incurred damages. The Salespeople are entitled to summary judgment

on their breach-of-contract claims.

1.   Relevant Facts

The terms of the Salespeople's employment at Alliance are set forth in agreements, updated annually, titled "Employment Compensation Outline." The title of the agreements is immaterial; the Salespeople will refer to them either by their title or as the "Compensation Agreements." Relevant terms include:

a.  The scope of work, i.e. ██████████████████████.

b.  ████████████████.

c.  ████████████████████████████████████████

██████.

d.  ████████████████.

*See* Exhibits 8 and 9.

There is no dispute that while employed by Alliance, Counter-Plaintiffs earned and were paid commissions in connection with their facilitation of laundry equipment sales. Stein Tr. 284:1-4; Doc. 45 at ¶7. These commissions were paid in accordance with the sliding scale below:



This sliding scale appeared in each of the Salespeople's respective employment agreements and remained the same throughout their employment.

There is no dispute that Williams, Adams, and Alliance understood the operation of the sliding scale i.e., that the  specific net profit percentages/ percentage ranges in the left column dictated the percentage of commission to be earned in the right column, such that where the net profit margin percentage on a sale fell between 10% and 14.5%, the Salespeople would be entitled to 2% of the gross sale revenue received for that sale. Stein Tr. 284:1-285:5; Doc. 22 at ¶114; Doc. 45 at ¶15. There is also no dispute that all parties understood their obligations under the Compensation Agreements, evincing inclusion of all essential terms. *Leesburg Comm. Cancer Center v. Leesburg Regional Medical Center, Inc*., 972 So. 2d 203, 206 (Fla. 5th DCA 2007).

2. <u>The Salespeople performed services for Alliance pursuant to valid agreements.</u>

Incredibly, Alliance has suggested that it never formed a valid agreement with either of the Salespeople. Doc. 45 at ¶¶ 16-18; Doc. 22 at ¶118.  That argument is specious. "These days, a contract simply is a promise, the breach of which has a remedy provided by law." *Koung v. Giordano*, 346 So. 3d 108, 114 (Fla. Dist. Ct. App. 2022) (citing Restatement (Second) of Contracts § 1 (1981)). "[F]or there to be a contract, there must be an offer, acceptance, consideration and sufficient specification of essential terms." *Id.* (cleaned up).  Whether characterized as "bilateral" or "unilateral," the Salespeople formed valid contracts with Alliance each year of their employment.

The Salespeople formed bilateral contracts with Alliance through an exchange of promises: the Salespeople agreed to sell Alliance products in a specified territory, and Alliance agreed to pay them a base salary plus commission on any sales. *See, e.g.*, *D.L. Peoples Grp., Inc. v. Hawley*, 804 So. 2d 561, 562-63 (Fla. Dist. Ct. App. 2002) (holding that a bilateral contract existed where employer agreed to pay a commission on successful recruitments and recruiter agreed, among other things, to "devote exclusive time and effort to [employer's] business" and to "operate in the territory assigned by [employer]"); *see also Mark Realty, Inc. v. Rogness*, 418 So.2d 373, 376 (Fla. App. 5 Dist. 1982).

Alternatively, Alliance offered a unilateral contract that it was bound to perform as soon as the Salespeople accepted by making a sale. "For a valid unilateral contract," the "'offer of a promise,' made in return for an act to be performed, becomes the *contracted* promise if accepted through performance by the offeree/promisee." *Koung* 346 So. 3d at 114-15. In *Koung*, for example, the contract at issue was simply a letter containing terms of settlement. *Id*. at 111. After complying with the terms of the letter, appellee rejected the acts of compliance and filed suit. *Id*. at 112. The issue before the appellate court was whether a valid contract had been formed. The court answered in the affirmative, finding a valid unilateral contract. *Id*. at 114. The court explained that the letter appellee sent constituted an offer of a promise, or "manifestation of willingness to enter into a bargain," which appellant could and did accept via performance. *Id*. at 114-115. By complying with the terms of the offered promise in the manner specified, appellee's offered promise became a "contracted promise" that could not be revoked by the appellee and functioned as a contractual obligation on the appellee's part. *Id*. 115-116. With respect to consideration, the court explained that the appellant's performance also provided the consideration necessary to support the contractual obligation formed. *Id*. at 115.

The same reasoning applies here. Alliance's annual provision of the "Employment Compensation Outlines" to the Salespeople was an offer of a promise

reflecting Alliance's willingness to enter a bargain with the Salespeople. The Salespeople accepted Alliance's offered promise each year through their performance, which also provided the necessary consideration. Thus, upon acceptance via performance of Alliance's offered promise to pay the Salespeople in accordance with terms of the "Employment Compensation Outlines," a contractual obligation on the part of Alliance was created.

3. <u>Alliance materially breached by not timely paying commissions.</u>

Pursuant to the annual Compensation Agreements, the Salespeople's

███████████████████████████████████████████████

████████████████████████. *See* Exhibits 8 and 9; Exhibit 22, Baker Tr. 147:13-20; 161:1-16.   However, Alliance repeatedly failed to timely pay the Salespeople's commissions. *See e.g.* Exhibit 23.

To establish a material breach, the party alleged to have breached the contract must have failed to perform a duty that goes to the essence of the contract. *Thomas v. Fusilier*, 966 So. 2d 1001, 1003 (Fla. 5th DCA 2007). Under Florida law, failure to make a timely payment constitutes a material breach where time is of the essence. *Centurion Air Cargo, Inc. v. United Parcel Serv. Co.,* 420 F.3d 1146, 1151 (11th Cir. 2005) ("Time is of the essence when…treating time as non-essential would produce a hardship."). As the Salespeople received only about $553 per pay period or $6.92/hr., per their $14,400 salary, timely payment of their commissions was of

the essence—a fact undoubtedly understood by Alliance, which set the Salespeople's base pay to an amount that does not even meet federal minimum wage requirements. Alliance's failure to timely pay the Salespeople's respective commissions thus constituted a material breach.

4. Alliance additionally breached the contracts at issue by not using the actual costs incurred in calculating the net profit margin for each sale

Under their Compensation Agreements, the Salespeople were to be paid in accordance with the net profit margin percentage made on the sale. There is no dispute of material fact as to how the net profit margin percentage was to be calculated as the calculation is reflected on each of their "Job Cost" sheets. A Job Cost sheet is the standard form generated and provided by Alliance to salespeople, including Adams and Williams, in connection with each sale to show how their commission was calculated and the amount owed as commission. *See e.g.* Exhibit 24; *see also* Exhibit 25, Bouthilet Tr. 240: 1-21; Adams' Decl. at ¶18; Williams' Decl. at ¶21.

As shown in Exhibit 24, all costs with the associated amount of the sale would be outlined by Alliance. As Salespeople were just salespeople, they were only privy to the final amount paid by the end user as reflected in the quote they prepared, and thus relied on Alliance to provide the dollar figures for the costs incurred in relation to the sale. Adams Decl. at ¶¶19-20; Williams Decl. at ¶¶ 22-23. Thus, the amounts

19

shown in Exhibit 24, reflect the dollar figures Alliance reported to the Salespeople as the costs incurred in relation to each sale. Exhibit 26, Ridings' Tr. 131:10-132:4.

The calculation of the net profit margin percentage was a two-step process. Net profit was calculated first by adding all the costs Alliance represented in the sheet and subtracting this sum from the gross sale revenue i.e., the total amount paid by the customer. The margin percentage was then configured by taking the net profit figure, dividing it by the total amount paid by customer, and then multiplying the quotient by 100 to get the percentage. *See* formula below:

**Net Profit = Gross Sale Revenue – Total Costs**

**Net Profit Margin Percentage = (Net Profit/ Total Revenue) x 100**

*See* Exhibit 24.

Alliance breached the Salespeople's Compensation Agreements by not using the actual costs incurred in relation to each sale they made. Alliance does not deny this. Stein Tr. at 286:20-25 (█████████████████████████████████ █████████████████████████████); *Id*. at 287:12-18; 290:4-12 (███████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████); *Id*. at 287:3-288:22; 290:25-291:4 (████████████████████████████████ ██████████████████████; *Id*. at 290:13- 292:14 (████████████████ ████████████████████████████████████████████████████

███████████████████████████████████████████

████████ ).

Under Florida law, "[c]ontract interpretation begins with a review of the plain language of the agreement." *Spungin v. GenSpring Family Offices, LLC*, 883 F. Supp. 2d 1193, 1198 (S.D. Fla. 2012) (*quoting Taylor v. Taylor*, 1 So. 3d 348, 350 (Fla. 1st DCA 2009)). "[W]here the language is plain, a court should not create confusion by adding hidden meanings, terms, conditions or unexpressed intentions." *Key v. Allstate Ins. Co*., 90 F.3d 1546, 1549 (11th Cir. 1996).

Here, the Compensation Agreements plainly state that the Salespeople would be paid commissions based upon the net profit margin percentage earned on each sale. The plain and ordinary meaning of net profit requires the use of the actual figures for the costs incurred, not figures that Alliance found convenient or beneficial or thought would be supported in the "marketplace." Additionally, Alliance made a concerted effort to hide that actual costs were not being used; evincing that it knew its conduct was wrong.  Stein Tr. 292:22-293:8 (███████

███████████████████████████████████████████

███████████████████████████████████████ );

Hand Tr. 90:19-91:21 (███████████████████████████

███████████████████████████████████████████

███████████████████████████████████ ); Exhibit 27, Reese

21

Tr. 245:5-9 (stating he is not aware of salespeople being told that there is a difference between the cost Alliance is actually incurring versus what they are told the cost is); *Id*. at 335:22-336:17 (stating compensation structure for salespeople in his office is "privileged" information and disclosure would be "frowned upon" or not a good thing in Alliance's eyes); *see also* Exhibit 28.

Alliance's admitted unilateral decision to use self-determined figures, as opposed to the actual costs incurred in relation to the sale, constitutes a material breach of the contracts at issue.

5. <u>The Salespeople have suffered damages caused by Alliance's breach.</u>

It is undisputed that the Salespeople have suffered damages as a result of each breach committed by Alliance. Because commissions made up over 90% of the Salespeople's pay, being paid late affected their ability to pay various household and living expenses. Adams' Decl. at ¶28; Williams' Decl. at ¶31. And because Alliance failed to use actual costs in computing net profit, the Salespeople were paid significantly less than what they were owed. As shown on Exhibit 29, and as confirmed by the Salespeople's former general manger, ███████████████

████████████████████████████████████████████

████████████████████████████████. Reese Tr. 245:5-246:4.

When reporting costs of equipment to the Salespeople, Alliance consistently used a figure that was ████████████████████████████████ of the

equipment. Bouthilet Tr. 235:17-20; Williams' Decl. at ¶33.  In reality, the actual cost of the equipment was ███████████████████████. Reese Tr. 245:5-246:4. Using higher costs artificially reduced the net profit earned, and in turn the net profit margin percentage, resulting in a lowered commission payment.

Despite the aforementioned admissions, and the Salespeople's repeated requests for production of the actual costs incurred in relation to their sales, Alliance has only produced the same self-serving documents that are at the center of this suit—the Salespeople's Job Cost sheets. *See e.g.* Exhibit 24. The issue was raised before this Court, wherein Alliance's counsel affirmatively represented that she would provide, without limitation, all responsive documents to ten specifically identified sales that were facilitated by Williams and Adams. Doc.131 at 8. Plaintiffs' production in response to actual costs was nothing more than further self-serving, self-generated documents filled out by Alliance's personnel, without any support as to where or how the figure being reported was calculated. Notably, ██████████████████ █████████████████████████████████████████████████████ ███████████████████████████. Reese Tr. 247:16-248:10; Adams' Decl. at ¶21.

It thus appears that Alliance, a ████████████████████ according to its Vice President, Hand Tr. 251:20-23, has no documents to support the actual costs incurred for the sales facilitated by Adams or Williams.  Notwithstanding that costs were

inflated across all categories (freight, delivery, mileage, etc.), the effect of Alliance's manipulation can be seen by just adjusting the equipment cost from what Alliance reported to salespeople to the cost actually incurred. *See* Exhibit 30.

## II.    Alliance cannot prove breach of loyalty.

To establish a breach of the duty of loyalty, Alliance must prove: (i) the existence of a duty of loyalty; (ii) a breach of that duty; and (iii) damages from the breach. *Cassedy v. Alland Investments Corp*., 128 So. 3d 976, 978 (Fla. 1st DCA 2014). Alliance alleges that the Salespeople breached their duty of loyalty by accessing, downloading, emailing, sharing, and using Alliance confidential information (excluding trade secret information). Doc. 98 at ¶92.  However, Alliance cannot meet its burden of proof on the elements of breach or proximate damages.

1. Alliance has not identified what "confidential information" is at issue.

Alliance claims that any information not rising to the level of a trade secret is deemed confidential and proprietary.   Doc. 98 at ¶17. That is not the law. Information is not confidential merely because Alliance says so. *CVB, Inc. v. United States*, 681 F. Supp. 3d 1314, 1316 (CIT 2024) ("Merely claiming information is confidential does not make it so. Were that true, a party could designate anything it wanted as confidential.").  It is well accepted that information is only confidential if it is not commonly known, not a matter of general knowledge, and not readily ascertainable.  *NCH Corp. v. Broyles*, 749 F.2d 247, 251-252 (5th Cir. 1985).

24

Alliance has failed to identify any specific confidential information at issue, instead providing a generalized list of categories of information that it designates as its "trade secret information" (which may also be its confidential information).  Dkt. 98 at ¶16. Such a list is too broad and vague to provide sufficient notice of the actual confidential information misappropriated.  *See e.g., Am. Registry, LLC v. Yonah*, 2013 U.S. Dist. LEXIS 171889 (M.D. Fla. 2013) (dismissing the plaintiff's FUTSA claim for lack of specificity). Alliance cannot prove its claim without identifying the specific confidential information at issue.  *See Tiger Supplies Inc. v. MAV Assocs. LLC*, 2022 U.S. Dist. LEXIS 99435 at *13 (D.N.J. June 3, 2022) (requiring reference to specific, confidential information to support a breach-of-confidentiality claim). Therefore, the claim should be dismissed.

2. <u>Even if the Court were to consider the general categories of information Alliance has characterized as confidential, most are not confidential as a matter of law, as they are commonly known, generally available, or shared without restriction.</u>

During discovery, Alliance identified "representative examples" of trade secret documents for each category of trade secret information identified in its complaint.  *See* Exhibit 31. However, as shown in the table below, most of these categories are not confidential, as they are either shared with third parties without any restriction, available online, or commonly circulated in the industry. *See Anich Indus. v. Raney*, 751 So. 2d 767, 771 (Fla. 5th DCA 2000) (information that is

commonly known in the industry and not unique to the allegedly injured party is not

"confidential"). *See Blackstone v. Dade City Osteopathic Clinic*, 511 So. 2d 1050

(Fla. 2d DCA 1987) (customer lists which can be compiled from readily accessible

sources are not protectable as confidential legitimate business interests).

| Category | Reason for Non-Confidentiality/ Non-applicability | Examples |
|---|---|---|
| a. **Customer communications, quotes, and drawings** | Shared with end users without restriction | Dakauskas Tr. 104:3-11 (quotes sent without NDAs)<br><br>Hand Tr. 176:14-18 (acknowledging customer shopping price has provided a quote from competitor)<br><br>Bouthilet 59:23-60:5 (no control over what customer might do with a quote)<br><br>Stein Tr. 58:3-11 (no NDA provided to customer and not told to keep confidential)<br><br>Exhibit 32 (███████████ ██████████ ██████████ ███████████ █████ ) |
| | Available online | *Compare* Exhibit 33, identified by Alliance as a trade secret document, with Exhibit 34, found online showing similar information; (Gyebi Decl. at ¶35) |

| | | |
|---|---|---|
| | | *Compare* Exhibit 35, identified by Alliance as a trade secret document with Exhibit 36, the same exact document found online. (Gyebi Decl. at ¶37 ) |
| | Provided to the Salespeople to be retained as their own records | Adams' Decl. at ¶¶16-17; *see also* Exhibit 37<br><br>Williams' Decl. at ¶¶ 20-21; s*ee also* Exhibit 38 |
| | Disclaimed as confidential | Hand 146:15-16 (█████████ ███████████) |
| **b. Customer leads, customer lists, and customer contact information** | Information compiled from public sources | Exhibit 39, (████████████ ████████████████████ ███████████████████ ██████████████████████ ████████████████ )<br><br>Adams Tr. 238:23-239:16 (referencing using list purchased from Fiverr); 207:7-16 (identifying public sources she received contact information from); 219:19-220:24 (same)<br><br>Exhibit 40 (list Adams purchased from third party service)<br><br>Hand Tr. 81:18-22 (if it can be accessed publicly Alliance does not consider it confidential)<br><br>Bouthilet 70:7-71:4 (used Google and found contact information of potential |

| | | |
|---|---|---|
| | | customers) |
| | | Reese Tr. 178:7-179:6 (acknowledging contact information of potential customers can be found online) |
| | Disclaimed as confidential | Hand Tr. 79:16-23 (customer name is not confidential) |
| | Provided to the Salespeople to be retained as their own records | Adams' Decl. at ¶16 (quote/ invoice has customer contact information); Williams' Decl. at ¶20 (same) |
| **c. Custom demographic reports** | Shared with end users without restriction | Exhibit 41 (███████████ ██████████████████ ████████████████████ ████████ ) |
| | | Reese Tr. 210:15-17; 211:5-13 (demographic reports not sent to customers with NDA and would not be illegal for them to forward it) |
| | | Bouthilet Tr. 118:18-119:12 (demographic reports are provided without NDAs and can be forwarded) |
| | | Stein Tr. 64:16-20 (demographic reports are not preceded by an NDA) |
| | Information compiled from public sources | Stein Tr. 63:15-64:15 (information in demographic reports is gleaned from US |

| | | public data) |
| | | Reese 210:4-14 (information for demographic reports from publicly available census data) |
| | | Bouthilet Tr. 117:2-13 (demographic reports could be done on Google and created by the last census) |
| | Disclaimed as confidential | Hand Tr. 227: 8-11 (never told demographic reports were confidential) |
| **d. Equipment pricing and price lists** | Share with third parties without restriction | Hand Tr. 58:25-59:6 (no prohibition against sharing price list with third party) |
| | | Reese Tr. 216:16-21 (price sheets not served with an NDA or other type of confidentiality agreement) |
| | Commonly circulated in the industry | Exhibit 42, Schoeb 70:14-71:17 (███████████ ███████████ ███████); *see also* Exhibit 43 (██████ ██████████) |
| | | Dakauskas Tr. 244:19 (price lists are out in the "marketplace") |
| **e. Images of Alliance customer equipment and specific voltage** | Disclaimed as confidential | Hand Tr. 76:15-23 (Alliance doesn't own customer equipment and determination of secretiveness or non-secretiveness would be left to the |

| **requirements** | | customer) |
| | | Bouthilet Tr. 121:22-25-122:3; 122:24-123:1 (photos of equipment are not confidential and no agreement is signed prohibiting sharing) |
| | Non-proprietary and viewable by third parties | Exhibit 44 (exemplar photo identified by Alliance) |
| | Accessible online | Exhibit 45 (accessibility of voltage information online) (Gyebi Decl. at ¶46) |

3.  <u>The remaining trade secret categories are inapplicable.</u>

Alliance has failed to identify the use or sharing of any financial information relating to Alliance customers and prospects or Alliance's comprehensive financial data, which would amount to a disloyal act perpetrated by Adams or Williams. Further, as salespeople for Alliance, there is no reason that either would have access to Alliance's financial data, as supported by the testimony of Alliance's own representatives. Dakauskas Tr. 258:3-8; Bouthilet Tr. 27:2-20; Reese Tr. 88:10-20.

4.  <u>To the extent Alliance relies on the violation of any policy within the Handbook to support the requisite element of breach, the claim fails as the Handbook is not a binding document and the confidentiality provisions contained therein are unintelligible.</u>

Alliance issued the first and only employee handbook Counter-Plaintiffs ever recall receiving in December 2022/ January 2023.  Exhibit 46 ("Handbook"); *see*

*also* Exhibit 47 (███████████████████████████████

████████). As discussed further below, neither the Handbook, nor the acknowledgment form accompanying it, constitute a binding agreement between Alliance and the Salespeople. Thus, Alliance cannot base the instant claim on the violation of a contractual obligation formed by the Handbook. Nor can Alliance rely on the Handbook as a policy statement, as the purported confidentiality policy is unclear and incomplete. A copy of the page is reproduced below.



The Handbook never defines, explains, or even describes what "Confidential Information" is. Also, these clauses were apparently excerpts from "Alliance

Laundry Systems' Confidentiality and Non-Solicitation Agreement" Baker Dep. 187:11-15. However, neither Adams nor Williams received or signed the referenced agreement and are not bound by any type of confidentiality and/or non-solicitation agreement with Alliance. Adams Tr. 44:14-17; Williams Decl. at ¶8.

5. <u>Absent requisite intent, the Salespeople have not breached their duty of loyalty to Alliance.</u>

Breach of fiduciary duty claim is an intentional tort in Florida. *Posner v. Essex Insurance Co.*, 178 F.3d 1209 (11th Cir. 1999). Neither Williams nor Adams acted with the requisite intent, especially in connection with any breach based on emailing information to their personal email addresses during their tenures at Alliance or in connection with Williams' download of documents from his folder, prior to leaving Alliance. Adams' Tr. 68:1-70:20; Williams'. Tr. 80:2-15; 75:14-76:10; 80:25-83:3. The averments of Adams and Williams on this issue are undisputed, and Alliance has no evidence contradicting the same. Therefore, the claim should fail.

6. <u>Adams was free to use customer lists she developed.</u>

It is well settled that an employee may take a customer list that he or she has developed. *Fish v. Adams*, 401 So. 2d 843, 845 (Fla. 5th DCA 1981). Adams' customer lists were a product of her own work. *See e.g.* Adams Tr. 259:17-260:3. Over the course of several years, Adams collected business cards, bought information from subscription services, ran Google searches, and visited any

establishment that she imagined would need laundry equipment. *Id*. This fact is substantiated by both record evidence and the testimony of Adams's former Alliance supervisor. Exhibit 39; *see also* Bouthilet Tr. 267:24-268:4. Alliance has no evidence to the contrary, and thus cannot claim a breach based on Adams's use of lists she developed.

7. Even if the Salespeople used any of the categories of information Alliance claims to be confidential information, Alliance has no evidence to support proximate cause for the damages alleged.

Alliance's claim for damages is speculative and unsupported by any evidence. Alliance has not shown that it has lost a sale due to the Salespeople using or sharing any confidential information owned by Alliance. Any sale that Alliance lost was due to its own lack of business acumen. *See e.g.* JOINTD0012280.



The Salespeople were likeable salespeople when they worked for Alliance. That did not change simply because their employer changed. The Salespeople were always, and continue to be, well within their rights to reach out to the contacts they gained by spending several hard-working years in the industry and to benefit from the relationships they formed. *Templeton v. Creative Loafing Tampa, Inc*., 552 So.

2d 288 (Fla. 2d DCA 1989). Moreover, as explained in Laundrylux's motion for summary judgment, Alliance has failed to provide a computation of damages or any other damages evidence.

8. <u>In the alternative damages should be limited, and punitive damages denied.</u>

Any damages should be limited to monetary gains, if any, that Alliance can establish were secured via use of its alleged confidential information. Punitive damages should be denied. No action undertaken by the Salespeople remotely rises to the level of maliciousness required. And Florida courts have denied an award of punitive damages for conduct far more egregious conduct than alleged here. *See e.g. Insurance Field Services, Inc. v. White & White Inspection and Audit Service, Inc.*, 384 So. 2d 303 (Fla. 5th DCA 1980).

## III.    Alliance cannot prove breach of contract.

Alliance alleges that the Salespeople breached its "Employee Handbook." But Florida's courts "have expressed a decided reluctance to find that provisions in an employee handbook or employer policies and procedures manual rise to the level of enforceable contract rights." *Newman v. Consolidated Dispatch Agency*, 2017 U.S. Dist. LEXIS 215659 (N.D. Fla. 2017) (quoting *Walton v. Health Care Dist. of Palm Beach County*, 862 So. 2d 852, 855 (Fla. 4th DCA 2003)); *Osten v. City of Homestead*, 757 So.2d 1243, 1244 (Fla. 3d DCA 2000) ("the provisions of the personnel manual to which the appellant refers are merely a policy manual

containing unilateral expectations and do not otherwise give rise to an enforceable contract between the City and the appellant").

The above cases demonstrate the tendency of Florida courts to view employee handbooks as guidelines to be followed rather than a contractual right. Alliance's Employee Handbook expresses the same sentiment, specifically stating that the Handbook "███████████████████████████████████████████ ████████████████████████████████████████████":



Exhibit 46, pg. 4. It also says that "█████████████████████████ ████████████████████████████████████████████████ ██████" *Id*.

For a contract to be formed, there must be (1) an offer, (2) an acceptance, (3) consideration, and (4) sufficient specification of the essential terms. *Kolodziej v. Mason*, 774 F. 3d 736, 741 (11th Cir. 2014). Here, Alliance cannot meet even the first element. An offer is a "manifestation of willingness to enter into a bargain…"

*Lee Cnty. v. Pierpont*, 693 So. 2d 994, 996 (Fla. 2d DCA 1997). The Handbook explicitly states that Alliance is not entering into any type of bargain. In addition to disclaiming the Handbook as a legal document, the Handbook goes on to state that none of its provisions constitutes an employment agreement or contract or guarantee of employment benefits. Exhibit 46, pg. 4. The Handbook provisions express a clear *unwillingness* to contract. Alliance made no actionable offer and thus there was nothing for the Salespeople to "accept." *Gibson v. Courtois*, 539 So. 2d 459, 460 (Fla. 1989) ("Absent mutual assent, neither the contract nor any of its provisions come into existence."). Because the existence of a valid contract is a question of law, and Alliance cannot establish the requisite elements for contract formation as a matter of law, the Salespeople are entitled to judgment in their favor.

## IV.    Alliance cannot prove its breach-of-contract claim against Adams.

### 1.    <u>The Release was unenforceable for lack of consideration.</u>

Following Adams' firing, Alliance forced Adams to sign an agreement releasing Alliance and its agents from all claims she may have or had against them. Adams' Decl. at ¶36. To secure her signature, Alliance and its agents, Baker, Hand, and Reese refused to pay Adams her commissions unless she executed the agreement. *Id*. at ¶¶34-37. A copy of the alleged agreement is attached as Exhibit B to Alliance's Amended Complaint. (Dkt. 98-2) ("Release"). Alliance claims that Adams breached the Release by retaining and failing to return Alliance's files and materials.  Doc. 98

at ¶¶ 108-109.  However, the Release was not a valid contract because it did not have consideration, which is a necessary element of contract formation. *See Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.,* 162 F.3d 1290, 1311 (11th Cir. 1998). Consideration exists when a party does something that it is not legally bound to do. *See Magnus v. Present*, 135 So.2d 417, 418 (Fla. 1961). Here, the only consideration that Alliance offered to Adams for signing the Release was $80,493.97, which was the exact amount of commissions that Alliance already owed to Adams for her sales. Exhibit 48; Baker Tr. 141:6-7 ("I believe aspects of this payment were earned commissions"). Therefore, Alliance did not give Adams anything new or additional for waiving her rights under the Release. The Release was thus unsupported by consideration and unenforceable as a matter of law.

2.  <u>The Release was unenforceable for duress and unconscionability.</u>

The Release is also unenforceable because it is unconscionable and was executed under duress. These are defenses that allow a party to avoid a contract that was made involuntarily or unfairly. *See AMS Staff Leasing, Inc. v. Taylor*, 158 So. 3d 682, 685 (Fla. 4th DCA 2015) (duress); *Powertel, Inc. v. Bexley*, 743 So. 2d 570, 574 (Fla. 1st DCA 1999) (unconscionability).

Duress occurs when a party's free will is overcome by some improper and coercive conduct by the other party. *Id.*  Here, Adams was coerced into signing the Release because Alliance withheld her commissions, which she needed to survive,

and refused to pay her unless she signed the Release.  Adams' Decl. at ¶38. Adams did not have the opportunity to consult with an attorney or negotiate the terms of the Release.  Adams' Tr. 187:9-17. She did not have the money to hire counsel to take on a billion-dollar company. *Id*. 189:1-6.  She signed the Release under pressure and fear of losing her livelihood.  *Id*. 189:11-12; Adams' Decl. at ¶38.  This constitutes duress and renders the Release invalid.  *See Leader Glob. Sols., LLC v. Tradeco Infraestructura, S.A. DE C.V.*, 155 F. Supp. 3d 1310, 1318 S.D. Fla. 2016).

A contract is unconscionable when it is both procedurally and substantively unfair. *See Powertel, Inc*., 743 So. 2d at 574.  Procedural unconscionability refers to the circumstances of contract formation, such as lack of meaningful choice, unequal bargaining power, or deception. *Id*. Substantive unconscionability refers to the terms of the contract, such as unreasonable, oppressive, or one-sided provisions.  *Id*.

Here, the Release was procedurally unconscionable because Adams did not have a meaningful choice as to the terms of the contract.  This Release was forced on Adams after she was fired, Exhibit 49, and the motivation for forcing Adams to sign the release was the fear that she would sue. *See* Exhibits 50 and 51.  Alliance and its agents purposely put Adams under duress to circumvent accountability for their illegal acts. These factors show that Adams did not enter the Release voluntarily or knowingly.  *See Romano v. Manor Care, Inc*., 861 So. 2d 59, 63-64 (Fla. 4th DCA 2004).

The Release was also substantively unconscionable because it contained terms that were outrageously unfair and one-sided. The Release required Adams to waive all her claims against Alliance, including those arising from her termination, unpaid wages, and retaliation. Doc. 98-2 at ¶ 2. The Release also required Adams to comply with a mutual confidentiality and non-disparagement provision, which was not supported by any separate or independent consideration. *Id*. at ¶ 3. The Release imposed these burdens on Adams without giving her any benefit or compensation beyond what she was already entitled to. *See id*. at ¶ 1. These terms were so harsh and unreasonable that they shock the conscience. *See Belcher v. Kier*, 558 So. 2d 1039 (Fla. 2d DCA 1990).

### 3. The Release was procured through fraud.

Finally, the Release was unenforceable because it was procured through fraud. Fraud is a misrepresentation or concealment of a material fact that induces a party to enter a contract. *See Buchanan v. Clinton*, 293 So.2d 120, 122 (Fla. Ct. App. 1974). A contract procured through fraud is never binding on an innocent party. *Id*.

Here, Alliance committed fraud by misrepresenting and concealing the method of calculating Adams' commissions. As explained above, Alliance did not disclose its departure from the terms of Adams' contract, and thus falsely lured Adams into believing the figure being presented to her was accurately calculated. *See* Adams Dep. Tr. at 135:24–136:13. Alliance deceived Adams into accepting a

lower amount of commissions and signing the Release by concealing the true method of calculation. *Id*. This constitutes fraud and vitiates the Release. *See Florida East Coast Railway Company v. Thompson*, 93 Fla. 30, 35, 111 So. 525 (1927).

**CONCLUSION**

Adams and Williams respectfully request judgment in their favor on all claims.

Respectfully Submitted,

**WILSON ELSER MOSKOWITZ EDELMAN& DICKER LLP**


By:   *s/Amaris C. Gyebi*
Jura C. Zibas
Florida Bar No:  124571
2063 Main Street - Suite 100
Sarasota, FL 34237
Telephone:  941-866-8561
Facsimile:   941-210-5979
Jura.Zibas@wilsonelser.com
Cheryl.Kujawski@wilsonelser.com

Amaris C. Gyebi, Esq.
Florida Bar No:  1019361
2063 Main Street - Suite 100
Sarasota, FL 34237
Telephone:  941-210-5961
Facsimile:   941-210-5979
Amaris.Gyebi@wilsonelser.com
Cheryl.Kujawski@wilsonelser.com

***Attorneys for Defendants/Counter-Plaintiffs/Third Party Plaintiffs***

*Trudy Adams and*
*John "Clay" Williams*

## WORD LIMIT CERTIFICATION

This memorandum in support of Defendants/Counter-Plaintiffs' Motion for Summary Judgment has 7,996 words (including the text, headings, footnotes, and quotations) and is therefore within the 8,000 word limit set forth in the Local Rule 7.1(F).

*/s/ Amaris C. Gyebi*
Amaris C. Gyebi, Esq.