UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

ALLIANCE LAUNDRY SYSTEMS LLC,

     Plaintiff,

v.

TRUDY ADAMS, et al.,

     Defendants.

----------------------------------------------------

TRUDY ADAMS, JOHN "CLAY" WILLIAMS,

     Defendants/Counterclaim
     Plaintiffs,

v.

ALLIANCE LAUNDRY SYSTEMS LLC,
GREG REESE, MIKE HAND, and
SAMANTHA BAKER,

     Plaintiff/Counterclaim Defendants/
     Third-Party Defendants.

Case No.: 23-cv-22130-MCR-ZCB

**ALLIANCE'S RESPONSE TO DEFENDANTS' MOTION TO STRIKE
EXPERT DECLARATION OF MARK LANTERMAN AND
EXCLUDE LANTERMAN'S TESTIMONY**

Mr. Mark Lanterman and his company, Computer Forensic Services, are

eminently qualified to provide forensic expert testimony and opinions in this

case.  Mr. Lanterman's declaration and testimony are straight-forward, reliable,

corroborated by Defendants' own testimony and evidence, and will assist the trier of fact in this case. Defendants' Motion to Strike should therefore be denied.

## BACKGROUND

### A.    MR. LANTERMAN'S QUALIFICATIONS

As detailed in Mr. Lanterman's expert declaration and attached curriculum vitae, Mr. Lanterman has over thirty-five years of experience in digital forensics and cybersecurity.  His credentials are as impressive as they are extensive.  (*See* Expert Declaration of Mark Lanterman, June 21, 2024 "**Original Decl.**" ECF No. 155-2 and Amended Expert Declaration of Mark Lanterman, January 10, 2025, "**Amended Decl.**," ECF No, 155-3.)[1]

As set forth in Mr. Lanterman's declaration, in the four years prior to the date of his declaration, he provided testimony in seventy-nine lawsuits in courts throughout the United States. (*See* Amended Decl., ¶3, Ex. A.) Mr. Lanterman has been certified by the United States Department of Homeland Security as a "Seized Computer Evidence Recovery Specialist" and has been certified in computer forensics by the National White-Collar Crime Center. (*Id.,* ¶5.) Mr. Lanterman has been appointed by both state and federal courts to act

---

[1] For convenience and brevity, Alliance will cite primarily to the Amended Decl. as it is the most recent document and includes everything in the Original Decl. plus additional information following production of Clay Williams' USB drive.

as a neutral computer forensic analysist or special master numerous times. (*Id.*) He has provided training and delivered keynote addresses regarding e-discovery and cybersecurity to the United States Supreme Court, the Eleventh Circuit Federal Judicial Conference, the Eight Circuit Judicial Conference, the Southern District of Georgia, the Western District of Tennessee, and several other state judicial conferences. (*Id.,* ¶10.) He currently serves on the Arizona Supreme Court's Steering Committee on Artificial Intelligence and the Courts. (*Id.,* ¶9.)

Mr. Lanterman is currently a faculty member of the University of St. Thomas School of Law and the National Judicial College in Reno, Nevada. He previously served as adjunct faculty of computer science for the University of Minnesota Technological Leadership Institute's Master of Science and Security Technologies program. (*Id.,* ¶7.)

Mr. Lanterman also has extensive experience in law enforcement. Not only has he served as a law enforcement officer in two jurisdictions, he has been sworn in as a U.S. Marshal and has served on the United States Secret Service Electronic Crimes Task Force. (*Id.,* ¶5; ; Giftos Decl., ¶2, Ex. 1 at 67:7-71:14.) While no longer an acting law enforcement officer, Mr. Lanterman's company, Computer Forensic Services, holds a corporate private detective license issued by the State of Minnesota Board of Private Detective and Protective Agent

3

Services and serves as the digital crime lab for dozens of law enforcement agencies in Minnesota.  (Amended Decl., ¶¶13, 15; Giftos Decl., ¶2, Ex. 1 at 17:12-18:7.)

Computer Forensic Services has been awarded a Multiple Award Schedule contract for the United States General Services Administration after a rigorous inspection and technical competence evaluation of knowledge, abilities, competency and procedures in cybersecurity and related forensics. (Amended Decl., ¶14.)

Mr. Lanterman earned a Bachelor of Science and Master's degree in computer science from Upsala College and a certificate in Cybersecurity: Managing Risk in the Information Age from Harvard. (*Id.,* ¶¶6; Giftos Decl., ¶2, Ex. 1 at 48:5-53:2.)  As discussed in more detail in Section C below, Defendants have taken great pains to attempt to discredit Mr. Lanterman by questioning his credibility on whether he obtained his degrees from Upsala College thirty-five years ago because he no longer has evidence of his attendance.  However, there is no evidence Mr. Lanterman falsified his credentials. To the contrary, Mr. Lanterman stands by his credentials. (*Id.* at 10:16; 61:16.)

B.    **METHODOLOGY AND FINDINGS**

Mr. Lanterman and Computer Forensic Services provide digital forensic analysis work in both civil and criminal matters.  (*Id.* at 19:2-22:1.)   The

majority of the civil cases they work on include allegations that are similar to those in this case, which involve allegations of theft of intellectual property. (*Id.*) Regardless of the type of case or the party they work with, however, Computer Forensic Services' forensic methods are always the same, as their methods include performing a strictly technical function as opposed to an analytical function. (*Id.*) No matter what side retains them, the results are what they are. (*Id.*)("It doesn't matter to us which side retains us, the- you know, it-I – I hate they saying "it is what it is," but typically we're preforming a – a-strictly technical function.") Indeed, this is one reason Computer Forensic Services is frequently appointed as a neutral or special master in cases because "it doesn't matter which side hires us; the outcome would still be the same." (*Id.*)

## 1.  METHODOLOGY USED IN THIS CASE

Mr. Lanterman's methodology and analysis in this case is straight-forward. After receiving defendant Adams' and defendant Williams' Alliance-issued laptop computers, Mr. Lanterman and his team created forensic images of each of the laptops. (Amended Decl., ¶¶17-19; Giftos Decl., ¶2, Ex. 1 at 104:15-113:2.) Once the images were created, Lanterman and his team identified the activities they were able to observe on those images by reviewing Microsoft Outlook, email container files, Windows operating systems records

and browser files. (Amended Decl., ¶¶29-51.)  Mr. Lanterman attached three exhibits to his declaration that specify the email and file activity observed on those devices, including (without limitation) emails Adams and Williams sent to their personal email accounts and 3,712 files defendant Williams copied to a USB drive on July 10, 2023, days before resigning from Alliance.  (*See id.*, Exs. B-D.)

In December 2024, after repeatedly claiming in discovery responses that he had no USB devices, defendant Williams produced a forensic image of a USB drive.[2]  (*See id.*, ¶52; Giftos Decl. ¶6, 7; Exs. 2, 3.)  Mr. Lanterman and team analyzed the image produced and were able to confirm it was the very same USB device they identified in Mr. Lanterman's report that Mr. Williams had used and downloaded files to during their initial forensic investigation. (*See* Amended Decl., ¶53.) Mr. Lanterman updated his declaration in January 2025 to identify these findings.  (*See id.*, ¶¶23, 52-57.)

### i.    ANALYSIS OF ADAMS' AND WILLIAMS' ALLIANCE-ISSUED LAPTOPS

As to the first two forensic images, Mr. Lanterman has explained that his team received the Alliance-issued laptop devices used by Ms. Adams and Mr. Williams during their employment via FedEx on March 21, 2024. (Amended

---

[2] Ms. Adams never produced a forensic image or device requested in this lawsuit.

Decl., ¶17; Giftos Decl., ¶2, Ex. 1 at 129:9-131:21.) Each of the laptops was encrypted using Microsoft BitLocker, which is a popular encryption software designed to protect the integrity of the data on the device it resides. (Amended Decl., ¶¶19-20.) Essentially, BitLocker prevents anyone from accessing the device unless they have the user's login credentials or an encryption key. (*See* Giftos Decl., ¶2, Ex. 1 at 110:4-111:14; 148:21-151:15; 206:8-12.)

Mr. Lanterman worked with Alliance's IT team to obtain the information necessary to decrypt the laptops and access their data for the purpose of preserving and analyzing each of the laptops. (Amended Decl. ¶19, Giftos Decl., ¶2, Ex. 1 at 148:21-151:15.) After obtaining the information necessary to access the content of the laptops, Mr. Lanterman created a forensic copy of the laptops' hard drives, preserving their data and operating systems. (Amended Decl., ¶ 20.) The preservation process was necessary to conduct a complete examination of the laptops and permitted Mr. Lanterman to assemble a timeline of user activities. (*Id.*).[3]

During his deposition, Mr. Lanterman explained the steps that are typically taken in creating forensic images and, to his recollection, the specific

---

[3] Complete copies of each of the two forensic images that served as the basis of Mr. Lanterman's opinions, were delivered to Defendants' consultant, BRG, on December 6, 2024. (Giftos Decl. ¶8.)

steps taken to create the forensic images in this case, which included communicating with Alliance regarding the laptop credentials, obtaining the necessary BitLocker keys or login credentials, connecting the device to a write blocker, which protects against inadvertent modification of the hard drive, plugging those into an imaging device, and creating the images. (Giftos Decl., ¶2, Ex. 1 at. 104:15-113:2; 133:1-25; 142:7-18.) The software used by Lanterman and team to create the image is a program called DD. (*Id.* at 142:7-15.)

Mr. Lanterman and team then analyzed the content of each image. Mr. Lanterman testified that they used the "very well-known commercially available" computer forensic application call Axiom as part of their investigation. (*Id.* at 173:11-174:7). They used the Axiom software for searching and putting together their timelines of activity and to identify USB activity on Adams' and Williams' laptops. (*See id.*)

As part of their analysis, Mr. Lanterman and team reviewed the content of the Outlook email container files on each device. (Amended Decl., ¶¶30-35, 40-46, Exs. A and B.) They were able to observe that Ms. Adams sent or received at least 37 emails from her Alliance-issued email account to her personal, non-Alliance email account between January 5, 2023 and May 19, 2023, which was her last day at Alliance. (*See id.*) Many of those emails had attachments. (*See*

*id.*)  Those emails were identified with specificity in Exhibit B to Lanterman's Declaration. (*See id.*) Examples of the emails observed include a deleted email dated March 27, 2023 with the subject line "All" that was sent from Adams' Alliance email account to her personal email account.  The email contained a spreadsheet listing of contact account information for 1,234 contacts.  (*See id.*) This email was produced in discovery by Alliance.  (Giftos Decl., ¶9, Ex. 5.)  This email was later sent on April 20, 2023, also produced by both Alliance and Defendants.  (*Id.* ¶10, Ex. 6.)  The email comprises a comprehensive report generated from Alliance's customer relationship management software and includes Alliance customer and prospect information. (Amended Decl., ¶34; Giftos Decl. ¶10, Ex. 6; ECF 167 at 7.)

Mr. Lanterman and team also analyzed Ms. Adams' laptop for evidence from Windows operating system records to determine whether Ms. Adams engaged in activity consistent with the access or copying of files to extrinsic sources, such as USB drives.  (Amended Decl., ¶¶37-39.)  Mr. Lanterman found that the evening prior to her separation from Alliance, at approximately 5:48 PM (Central), Adams attached a SanDisk Cruzer USB drive to her Alliance-issued laptop.  (*Id.*)  The image did not contain sufficient information to determine whether or what files were accessed and, despite requesting the

device during discovery, Ms. Adams never produced a USB device.  (*Id.,* ¶¶ 37-40; Giftos Decl., ¶¶11,12; Exs. 7,8.)

Mr. Lanterman performed a similar analysis of the forensic image of Mr. Williams' Alliance issued laptop and found that Mr. Williams also emailed numerous emails and files from his Alliance-issued account to his personal, non-Alliance email account.  (Amended Decl., ¶¶42-45. Ex. C.)  Information on each of those emails and their attachments are identified in Exhibit C to Lanterman's Declaration.  (*Id.*)

Mr. Lanterman also observed that on July 10, 2023, three days prior to Mr. Williams' departure from Alliance, Mr. Williams accessed his personal Gmail account via web browser, and reviewed the content of an email bearing the subject line "FW: Trudy List." (*Id.,* ¶47.)  While Defendants did not produce this email until the last day of discovery, they ultimately did produce it.  (Giftos Decl., ¶¶13-16, Exs.9-12.)  That email contained an attachment of partial information regarding Alliance customers.  (*See id.*)  Shortly after receiving this email, Williams sent the document back to Adams, with updated contact and deal information pertaining to Alliance customers.  (Giftos Decl., ¶17; Ex.13.)

Mr. Lanterman and team also observed via Microsoft Windows records that approximately two hours later on the same day, Mr. Williams attached a USB device and copied 3,712 documents to that device.  (Amended Decl., ¶47-

51.)  Mr. Lanterman attached as Exhibit D to his declaration a detailed listing of those files.  (*Id.,* Ex. D.)

### ii.    ANALYSIS OF FORENSIC IMAGE OF USB DEVICE PRODUCED BY DEFENDANTS

On December 13, 2024, defendants produced a forensic image of a USB device.  (*Id.,* ¶52.)  Mr. Lanterman and team then analyzed that forensic image and were able to conclusively identify that it was the same SanDisk Cruzer Glide USB drive with the same serial number that they had previously observed had been attached to Williams' Alliance-issued laptop to download over 3700 files. (*Id.*, ¶¶52-55 and fn. 8.)

They were also able to identify that the vast majority of the 3,720 files on the USB forensic images were the same as the files they identified as having been downloaded from Williams' laptop on July 10, 2023.  (*See id.*)  Mr. Lanterman was able to make this determination by comparing the hash values of the files on Williams' laptop image with the hash values of the files on the USB image.  (*See id.*)  In his report, Mr. Lanterman explains that a hash value is a "digital fingerprint" that is unique to a file and its content.  (*See id.*)

Mr. Lanterman was also able to observe that the USB device produced by Mr. Williams had been attached to other, unascertainable computers on at least four occasions after Mr. Williams downloaded the files on July 10, 2023.  (*See*

*id.*)  Specifically, they were attached to computers on July 21, 2023, July 23, 2023, August 11, 2023 and July 17, 2024[4] and were, on two of those dates, downloaded *en masse*.  (*Id.,* ¶¶56-57.)

### iii.    PEER REVIEW CONDUCTED

At Computer Forensic Services, it is standard procedure to peer review all of the forensic work they conduct.  (Declaration of Sean Lanterman, March 28, 2025 "S. Lanterman Decl.," ¶3.)  This occurs at multiple stages.  (*Id.*)  First, once data is made available for analysis or otherwise preserved (*e.g.,* by the creation of forensic copies of source devices/material), the lead analyst as well as two (2) additional Computer Forensic Services analysts, each conduct their own independent analyses of such data. Once these independent analyses are completed, the results are shared between the assigned personnel for purposes of comparison and discussion about their respective findings. (*Id.,* ¶4.)  Then, when a report or other dispositional communication is prepared for submission, the other two (2) Computer Forensic Services forensic analysts review its content to ensure that it is complete and factually accurate.  (*Id.,*¶5.)

Computer Forensic Services' extensive peer review process was undertaken in this case, with three seasoned forensic analysts reviewing the

---

[4] Notably, the July 17, 2024 was between Defendants' two sets of discovery responses dated June 24, 2024 and October 8, 2024 wherein in each they claimed the USB did not exist. (Giftos Decl., ¶¶6, 7; Exs. 2, 3.)

forensic images and fact checking the final findings. (*See id.,* ¶6; *see also* Giftos Decl. ¶2, Ex. 1 at 14:3-15:16; 211:13-19.)

### iv. ANALYSIS CONFIRMED BY DOCUMENTS AND EVIDENCE PRODUCED IN THIS CASE

Mr. Lanterman's observations of emailing, browser access and downloading by Ms. Adams and Mr. Williams have been confirmed by the documents and evidence submitted by both parties in this case. Indeed, as set forth above, Williams produced the USB device that he used to download thousands of files, which included the files identified in Lanterman's Declaration. When asked about the USB drive, Williams admitted that he downloaded the files from his Alliance device to the USB Drive. (*Id.*, ¶18, Ex. 14 at 123:6-23)

While defendants Adams and Williams largely testified that they "don't recall" their activities or communications with each other prior to leaving Alliance, Defendants produced many of the emails that were identified in Mr. Lanterman's report. For example, Defendants have produced every single document identified in Exhibit C to the Lanterman Declaration. (Giftos Decl., ¶19, Ex. 15.)

On the last day of discovery, Adams also produced the "FW: Trudy's List" email that Mr. Lanterman observed Williams reviewing on July 10, 2023 along

with Mr. Williams' response. (Giftos Decl., ¶17, Ex. 13.)   That email and attachment, which are discussed in Alliance's motion for summary judgment (ECF No. 167, pp. 12-15), demonstrate that Adams sent Williams an email on July 10, 2023 at 11:31 am entitled "Trudy's List."  (*Id.* 14) That email included an excel spreadsheet attachment that contained a partial list of laundry businesses.  (*Id.*) The same day, at 12:18 am, Williams responded, sending Adams an updated spreadsheet that included customer names, contact information and notes regarding the businesses. (*Id*. at 15)   All of the information updated by Williams were Alliance customers.  (*Id.* at 13-15.)

## C.   DEFENDANTS DID NOT RETAIN OR DISCLOSE THEIR OWN TESTIFYING FORENSIC EXPERT SO THEY RESORT TO UNSUBSTANTIATED ALLEGATIONS OF PERJURY.

The Defendants made a strategic choice not to retain a testifying forensic expert in this case.  After substituting counsel in September 2024, Defendants attempted to reverse course and moved the Court to reopen the expert disclosure schedule. (ECF Nos. 61, 67.)  The Court denied that request (ECF No. 74), presumably because the expert disclosure deadline, which had been extended multiple times, had long passed.

Because Defendants do not have their own testifying forensic expert, Defendants have resorted to unprecedented and repeated unsubstantiated personal attacks on Mr. Lanterman.

14

Indeed, Defendants' counsel spent a significant amount of time during Mr. Lanterman's deposition accusing him of lying about his college education because they had been unable to locate his transcript from another entity which reportedly now maintains Upsala's transcript files after it lost accreditation and closed thirty years ago.[5]  (Giftos Decl. ¶2, Ex. 1 at. 28:18-66:25, 87:19-88:23, 269:17-271:20.)

Mr. Lanterman testified that he had attended Upsala College and had received a bachelor's degree and a master's degree in computer science in the 1980s.  (*Id.* ¶2, Ex. 1 at 28:20-29:2.) He testified that he was a commuter student that lived with his grandparents at the time, who lived in Morristown, New Jersey, which is approximately thirty minutes from the college. (*Id.* ¶2, Ex. 1 at 30:6-16.)

He testified that his understanding was that Upsala College was shut down by the state of New Jersey in the early 1990s.  (*Id.* ¶2, Ex. 1 at 29:4-16.) While he didn't closely follow what was going on with the school, his understanding was that the school shut down following allegations of financial fraud and due to bad recordkeeping.  (*Id.* ¶2, Ex. 1 at 39:10-19.) He opined that

---

[5] Notably, Defendants' counsel also accused Mr. Lanterman of lying about his Harvard certification during his deposition, but now they appear to have corroborated that information as they do not raise it in their motion.

may have been why counsel for defendants were unable to obtain his transcript. He also testified that he had previously attempted to get his transcript and was unable to obtain it. (*Id.* ¶2, Ex. 1 at 33:2-11.)



The allegations against Mr. Lanterman by ███████████████████ Defendants in this case, has in the past few weeks resulted in significant media coverage and Mr. Lanterman being investigated due to his inability to verify his

educational credentials at Upsala College. (*Id.* ¶20, Ex. 4.)  As a result, Computer Forensic Services has been forced to make the difficult decision of requesting Mr. Lanterman to step down from his duties as a forensic analyst at Computer Forensic Services until the investigations against him are completed. (S. Lanterman Decl., ¶¶7-8.)

While Alliance is continuing to conduct its own investigation and due diligence on this issue since it has arisen, one thing is clear: whether or not Mr. Lanterman went to Upsala College is an open issue under investigation and difficult to determine given Upsala College closed thirty years ago and apparently has partial records disbursed among two new institutions.  (*Id.* ¶20, Ex. 4).

Regardless, in the wake of the sideshow presented by Defendants regarding Upsala College, Alliance (at great expense) has confirmed much of Mr. Lanterman's experience, including his employment with two police departments, involvement in the United States Secret Service, being confirmed as a U.S. Marshal, being a member of the Hopkins Police Department, and being faculty at various institutions.  Alliance's investigation is ongoing.  (*Id.* ¶¶3-5, 25-27, Exs. 20-23.)

**ARGUMENT AND AUTHORITIES**

I.    **MARK LANTERMAN IS HIGHLY QUALIFIED IN COMPUTER FORENSICS, HIS EXPERT TESTIMONY AND OPINIONS ARE RELIABLE AND HIS OPINIONS WILL ASSIST THE FINDER OF FACT IN THIS CASE.**

The requirements for the admission of expert testimony in light of *Daubert* are well known. "Expert testimony may be admitted into evidence if: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony assists the trier of fact, through the application of scientific, technical or specialized expertise, to understand the evidence or to determine a fact in issue." *City of Tuscaloosa v. Harcros Chemicals, Inc.,* 158 F.3d 548, 562 (11th Cir.1998). There are thus three discrete inquiries: qualifications, relevance, and reliability. *See Quiet Technology DC–8, Inc. v. Hurel–Dubois UK Ltd.,* 326 F.3d 1333, 1341 (11th Cir.2003) (although there is "some overlap" among these inquiries, they "are distinct concepts that courts and litigants must take care not to conflate."). The burden of establishing these three requisites lies with the proponent of the evidence. *United States v. Frazier,* 387 F.3d 1244, 1260 (11th Cir.2004) (*en banc* ).

"Faced with a proffer of expert scientific testimony ... the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of

fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. at 592–93, 113 S.Ct. at 2796 (1993).

### A. MR. LANTERMAN IS QUALIFIED TO TESTIFY COMPETENTLY REGARDING THE MATTERS SET FORTH IN HIS EXPERT DECLARATION.

Experts may be qualified in various ways.  Fed R. Evid. 702; *U.S. v. Frazier,* 387 F.3d 1244, 1260 (11th Cir. 2004).  While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status.  *Id.,* 1260-1261.  "In fact, the plain language of Rule 712 makes this clear: expert status may be based on 'knowledge, skill, experience, training or education."  *Id.* at 1261 (emphasis in original).  "The Committee Note to the 2000 Amendments of Rule 702 also explains that '[n]othing in this amendment is intended to suggest that experience alone … may not provide a sufficient foundation for expert testimony."  *Id., quoting* Fed.R.Evid. 702 advisory committee's note (2000 amends.).

Here, as detailed above and in Mr. Lanterman's expert declarations, Mr. Lanterman has thirty-five years of experience in computer forensics.  He has been involved in hundreds, if not thousands, of cases over the years and, has

provided the exact type of technical forensic review and observation that he is providing in this case. He has received extensive training and certifications in computer forensics. Even if Mr. Lanterman did not go to Upsala College – which he states he did – he is still more than qualified to provide the very straightforward technical analysis that he is providing in this case.

### B. MR. LANTERMAN'S METHODOLOGY IS RELIABLE.

In ascertaining the reliability of a particular scientific expert opinion, courts consider, to the extent possible: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community. *McCorvey,* 298 F.3d at 1256 (citing *Daubert,* 509 U.S. at 593–94, 113 S.Ct. at 2796–97). Notably, however, these factors do not exhaust the universe of considerations that may bear on the reliability of a given expert opinion, and a federal court should consider any additional factors that may advance its Rule 702 analysis. *See Kumho Tire,* 526 U.S. at 150, 119 S.Ct. at 1175.

That said, while "[r]ulings on admissibility under *Daubert* inherently require the trial court to conduct an exacting analysis of the proffered expert's methodology," *McCorvey,* 298 F.3d at 1256, it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered

evidence. Indeed, "[a] district court's gatekeeper role under *Daubert* 'is not intended to supplant the adversary system or the role of the jury.' " 253 F.3d at 666 (quoting *Allison v. McGhan* 184 F.3d 1300, 1311 (11th Cir.1999)). Quite the contrary, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596, 113 S.Ct. at 2798. It would be an error for a district court to misconstrue its role as a "gatekeeper" envisioned by *Daubert* if it attempted to evaluate the *credibility* of an expert or the persuasiveness of competing scientific studies, as that role is for a fact finder. *See Ambrosini v. Labarraque,* 101 F.3d 129, 141 (D.C.Cir.1996) ("By attempting to evaluate the credibility of opposing experts and the persuasiveness of competing scientific studies, the district court conflated the questions of the admissibility of expert testimony and the weight appropriately to be accorded such testimony by a fact finder")*.*

Here, Defendants claim Mr. Lanterman's testimony is "not reliable" for two reasons. Specifically, they claim Mr. Lanterman's testimony and report are not reliable because Mr. Lanterman has not provided documentary evidence that he graduated from Upsala College. Defendants argue that Mr. Lanterman's testimony and report are unreliable because they allege that he outright

refused to provide any of the methodology he used to reach his opinions.  Both arguments fail.

First, whether or not Mr. Lanterman was truthful about  his attendance at Upsala College is a question regarding the credibility of Mr. Lanterman and the persuasiveness of the proffered evidence, not whether the evidence is admissible.  Thus, striking Mr. Lanterman's report and testimony on this ground would be improper as those are questions appropriately determined by a fact finder.  *See id.*

Second, Defendants' claim that Mr. Lanterman's methodology is unreliable because he "refused to describe any methodological process" is inaccurate and readily contradicted by Mr. Lanterman's declarations and full testimony.  While Mr. Lanterman declined to detail specific *proprietary* methods that Computer Forensic Services uses in conjunction with the commonly used tools relied on in the industry, Mr. Lanterman has provided significant detail on his methodology, processes and software used as part of the investigation and analysis.[7]

---

[7] Notably, counsel for Defendants spent more time questioning Mr. Lanterman about other cases and hypothetical situations than he did asking him details about Mr. Lanterman's report or findings.  Likewise, Defendants improperly attempted to use their forensic consulting expert during the deposition to force Mr. Lanterman perform a separate analysis of a forensic image in real time rather, again, than utilizing their own testifying expert to rebut Mr. Lanterman's findings.  (*see generally* Giftos Decl. ¶2, Ex. 1.)

Indeed, Mr. Lanterman described how he and his team used forensically sound procedures to access and create forensic copies of Ms. Adams' and Mr. Williams' Alliance-issued laptop computers in his declaration and in his deposition. Mr. Lanterman described how they then analyzed those images by reviewing Microsoft Outlook, email container files, browser history and Windows operating records to determine that Adams and Williams had emailed documents and information from their Alliance email accounts to their personal accounts, communicated regarding an email with the subject "Trudy's List," and attached USB devices to their Alliance-issued laptops. From there, he created a timeline and record of activities he observed on those computers. He also identified some of the industry standard digital forensic software tools used to create and analyze the forensic images in this case.

Notably, Defendants don't claim that the findings of Mr. Lanterman's report are inaccurate. To the contrary, as set forth above, Defendants' own documents and forensic images in this case have confirmed Mr. Lanterman's findings. This is unsurprising as, again, Mr. Lanterman's methodology and analysis are technically sound, reliable, and have been peer reviewed.

The current scientific foundations of digital forensics have been recently reviewed and described in a November 2022 report published by the National Institute of Standards and Technology (NIST) entitled "*Digital Investigation*

*Techniques: A NIST Scientific Foundation Review.*" (Giftos Decl., ¶29, Ex. 24.) To address the question of the scientific basis of digital investigation, NIST examined the scientific literature on digital forensics as well as information from multiple other sources, including digital investigation techniques from peer-reviewed sources, academic and classroom materials, technical guidance from professional organizations and independently published resources. (*See id.* at pp. 2, 2.)

NIST noted that there are often multiple ways to search for digital information and that two examiners may find different subsets of all potentially relevant information. (*Id.*, p. i.) The methods used in digital investigations are often not peer-reviewed in a formal process, but trustworthiness is established by members of the digital forensics community trying out proposed methods, testing, and circulating updates within the community. (*Id.*)

NIST found that digital evidence examination rests on a firm foundation based in computer science. (*Id.*, p. 2.) Several of the techniques used have been extensively studied and documented in peer-reviewed literatures. Others, as set forth above, are documented more informally through community discussion forums. (*Id.*) The application of these computer science techniques to digital investigations is sound, only limited by the difficulties of keeping up with the complexity and rapid pace of change in IT. (*Id.*)

While there are many ways to organize tasks performed in digital investigation, NIST identified the following "foundations" of the main digital forensic tasks:

- **Protect original data from unintended modification**. This is accomplished using a variety of approaches depending on the type of device that contains the data.

- **Acquire digital data**. This step is accomplished by copying data to an image file.

- **Ensure integrity of acquired data**. Cryptographic hashing is used to ensure that if acquired digital data are changed inadvertently or deliberately the change can be detected.

- **Recover deleted data**. In some situations, recovery and reconstruction of deleted data make it possible to bring back deleted files (in whole or in part) or internal records from within an application file.

- **Navigate the acquired digital data**. This is accomplished by unraveling, i.e., parsing the layout of the acquired data. This is best performed using a software tool.

- **Identify and extract data artifacts**. Items of interest are identified, located, and extracted.

25

- **Analyze.** Examination of extracted artifacts can help develop a narrative or reconstruction of relevant events for inclusion in a final report.

(*See id.*, pp. 3, 30-31.)  The techniques applied to a specific case depend on the type of information likely to be useful for understanding what happened.  (*Id.,* p. 21.)  A digital investigation begins with an evaluation of the case context and the digital devices being examined. (*Id.*) An examination of a seized mobile phone from a suspected drug dealer might begin by reviewing contacts (possible customers and collaborators) and messages (setting up illegal transactions). (*Id.*) A suspected espionage case might require the examiner to look for contraband (classified documents), removable device history (moving the contraband around), geolocator information (places the suspect has visited), contacts (identify collaborators), messages (extraction of planned actions) and deleted documents (hiding activity). (*Id.*)

As set forth in Mr. Lanterman's expert declarations and deposition, Mr. Lanterman's processes included the tasks identified by NIST in forensic investigations.  Mr. Lanterman explained that prior to his investigation, he familiarized himself with the allegations in the case by reviewing the complaint.

Mr. Lanterman explained the steps used to collect and acquire the digital data from Adams' and Williams' Alliance-issued laptops and preserve them

onto forensic image files.  He discussed using software tools to analyze the data and to identity data artifacts.  He also discussed using hashing to review and validate data on the forensic image of Mr. Williams' USB device.  He analyzed the information found throughout the investigation to develop a narrative or reconstruction of relevant events for inclusion in a final report.

Defendants have not produced any law or evidence that would support a finding that Mr. Lanterman's methods were unreliable. Instead, they simply cite to cases wherein the experts in question provided absolutely no basis whatsoever for their findings.  Indeed, the first case they cite, *U.S. v Frazier,* involved a sexual assault investigation and very different methods of investigation.  387 F.3d 1244 (11th Cir. 2004).  In that case the court excluded the expert's report as unreliable because he had not provided *any* specific basis – qualitative, empirical or otherwise- for his opinions. *See id. at* 1265*.* (Holding that an expert's finding that certain materials "would be expected" in a sexual assault analysis was not supported by proffered expert's statement that this expectancy would come from his experience alone without any further basis.") That is not the case here as, again, Mr. Lanterman has described his methodology, tools and concreted findings in his report and in his deposition (to the extent asked).

Likewise, in the *FedEx Ground Package* case cited by Defendants, the claims at issue were for copyright infringement and trade secret misappropriation regarding two versions of certain software programs.  *See FedEx Ground Package System, Inc. v. Applications Intern. Corp.,* 695 F.Supp.2d 216 (W.D. Pa. 2010.)   Specifically, the defendant claimed that FedEx, the plaintiff, had improperly accessed and copied certain source code that had been registered with the U.S. Copyright Office.  *See id.* at 217-218.  The court struck the testimony of defendants' forensic expert because: (1) the proffered expert was testifying regarding legal conclusions and rendering legal opinions; and (2) the proffered expert failed to set forth any reasoned methodology employed in forming his opinions and instead simply referred to his life experience.  *See id.* at 221-224.  Indeed, he did not mention any methodology used at all and admitted that he did not even compare the source code that was at issue in the case.  *See id.*  The *FedEx Ground Package* case is readily distinguishable to this case as, again, Mr. Lanterman has explained his methodology, and he reviewed and analyzed the materials at issue in this case.  He has also testified that he is not offering any legal opinions:

> Q.   Has there ever been an instance in which you were approached or retained by a plaintiff, provided analysis, concluding that there was no theft of trade secrets, and your services were not relied on in the litigation?

MS. GIFTOS: Object to form.

**A.**    (continuing) I – I don't know.

Q.    Can you remember an instance like that?

A.    I – the reason why I'm – I'm – I'm struggling to answer that is because I don't think I'm qualified to determine if something is a trade secret or not.

Often what our findings could be is whether or not data moved from one device to another or perhaps it was uploaded from a computer to a cloud account.  It's for someone else to determine if its intellectual property.

Q.    I agree.  And – and I'm sorry if my question was confusing for that reason.  And – and, just to be clear, in this case, you are not providing any opinion about whether any of the materials at issue were protected by intellectual property. Correct?

A.    Correct.

(Giftos Decl. ¶2, Ex. 1 at 22:1-23:1)

In the third case cited by Defendants, *U.S. v. Garner*, the court excluded a forensic expert's opinions in a child pornography case because his opinions themselves were not reliable.  2012 WL 6680395, *3 ("Here, the United States does not challenge Mr. Moshlack's credentials as a computer forensics expert of the methodology he used (i.e. computer forensic examination using Forensic Took Kit [software]. But the United States contends that Mr. Moshlak's conclusions are neither reliable nor relevant so he should not be allowed to

testify at all during trial.").  Here, Defendants do not question Mr. Lanterman's findings and, again, his findings have been confirmed by the evidence produced in this case. Defendants now simply question Mr. Lanterman's credibility and the reliability of his methodology.

Finally, in the *Troudt v. Oracle Corporation* case cited by Defendants, the plaintiffs in a class action claimed that the defendant violated ERISA by, *inter alia*, allegedly paying excessive recordkeeping fees to the defendants' recordkeeper and trustee for its 401(k) plan.  369 F. Supp.3d 1134, 1138 (D. Colo. 2019).  The expert was not a forensic expert, but was providing opinions on what constituted a reasonable fee in the case.  *See id.*  The court noted that in the *Daubert* analysis, identifying the methodology employed by an expert is not a particularly high bar.    "Conceptually determining the witness' methodology is as simple as asking ... how did the witness reach his or her opinion or conclusion."  The court found the proffered expert did not clear even that low hurdle "because the facts on which [his opinion] was based are wholly opaque."  *See id.* at 1139.  He had relied only on his experience as an expert and he proffered no analysis whatsoever that would permit a third party to recreate his results.  *See id.*  The court noted that "'while experience may qualify an expert...credentials alone to not suffice' to establish that the expert's opinion has a reliable basis in fact.  'Experience is not a methodology.  Methodology is

the process by which the expert relates his experience to the facts at hand in order to reach an expert opinion.'" *Id.* (internal citations omitted).

Again, that case is readily distinguishable. Mr. Lanterman is not relying on his credentials as the basis for his expert opinion rather than a specific methodology. To the contrary, Mr. Lanterman described his methodology in his declarations and deposition (to the extent he was asked), he disclosed the emails and documents he identified in his analysis, and he disclosed complete copies of the forensic images that he created and relied upon, which would readily permit a third-party expert to recreate his results.

Mr. Lanterman's methodology has been disclosed and is reliable.

### C.    MR. LANTERMAN'S METHODOLOGY IS RELEVANT.

In addition to Mr. Lanterman being qualified and his methodology being reliable, Mr. Lanterman's analysis and opinions are highly relevant and would assist the trier of fact in understanding Adams' and Williams' activities prior to leaving their employment to join Laundrylux. They also confirm that the USB drive produced by Williams is the same drive he used to download thousands of documents days prior to resigning. Understanding Windows records and email containers to identify activities is not something a lay witness is likely to understand without Mr. Lanterman's testimony.











████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████

## CONCLUSION

Because Mr. Lanterman's declarations and testimony meet the exacting

standards of *Daubert*, Defendants' motion to strike should be denied.

Dated:  March 28, 2025

/s/ Melinda S. Giftos
Melinda S. Giftos, Florida Bar No. 0302960
Gabrielle B. Adams (admitted pro hac vice)
Angela B. Harden (admitted pro hac vice)
Brendan R. Zee-Cheng (admitted pro hac vice)
Jason K. Smathers (admitted pro hac vice)
Delia Maria Berrigan (admitted pro hac vice)
**HUSCH BLACKWELL LLP**
33 E. Main Street, Suite 300
Madison, Wisconsin 53703
Telephone: 608.234.6076
mindi.Giftos@huschblackwell.com
*Attorney for Plaintiff, Alliance Laundry Systems*
*LLC and Third-Party Defendants, Greg Reese,*
*Mike Hand and Samantha Baker*

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)</u>

I  certify  that  this  brief  has  7834  words,  excluding  the  case  caption,

signature block, and certificate of service, as calculated by the word processing system used to create this document.

*/s/ Melinda S. Giftos*

## **CERTIFICATE OF SERVICE**

I certify that on March 28, 2025, a true and correct copy of the foregoing was submitted to the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Melinda S. Giftos*