# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**ALLIANCE LAUNDRY SYSTEMS LLC,**

      **Plaintiff/Counter Defendant,**

**v.**                                            **CASE NO. 3:23cv22130-MCR-ZCB**

**TRUDY ADAMS,**
**JOHN WILLIAMS also known as**
**CLAY WILLIAMS, and**
**AUTARKIC HOLDINGS INC**
**doing business as LAUNDRYLUX,**

      **Defendants.**
_____/

**TRUDY ADAMS, and**
**JOHN WILLIAMS,**

      **Counter Claimants/Third Party Plaintiffs**

**v.**

**ALLIANCE LAUNDRY SYSTEMS LLC,**

      **Counter Defendant,**

**MIKE HAND, SAMANTHA BAKER, and**
**GREG REESE,**

      **Third Party Defendants.**
_____/

## ORDER

Plaintiff Alliance Laundry Systems, LLC ("Alliance") brought suit against the Defendants—two former employees, Trudy Adams and John Williams, and their new employer Autarkic Holdings, Inc., doing business as "Laundrylux"—alleging the misappropriation of trade secrets, tortious interference with business relationships, and breaches of contract and the duty of loyalty. Laundrylux has moved to strike Alliance's expert witness, Sean Lanterman. ECF No. 273. Having considered the motion, Alliance's response, ECF No. 278, and Laundrylux's reply, ECF No. 280, the Court concludes that the motion is due to be granted.

## I.    Background

Alliance originally disclosed Mark Lanterman of Computer Forensic Services ("CFS") as its computer forensics expert. Lanterman conducted a forensic examination of laptop computers provided by Alliance and determined that Adams and Williams had each emailed files to their personal email accounts and attached portable external USB drives to their laptops shortly before leaving their employment with Alliance. Laundrylux deposed Lanterman and filed a Rule 702 motion to strike, challenging his credentials and his failure to explain his methodology.

CASE NO. 3:23cv22130-MCR-ZCB

After the motion had been fully briefed and discovery closed, Alliance notified the Court that Mark Lanterman had withdrawn from the case due to an investigation into his credentials; as a result, he had retired and would be unavailable to testify. Alliance moved to substitute Mark's son, Sean Lanterman, a Director at CFS, as its expert.[1] Sean stated by declaration that he had asked Mark to step down from his position in the company due to an ongoing investigation into Mark's credentials, and that he (Sean) would step in as Alliance's expert because he had been involved in the case from the outset as a peer reviewer.[2] The Court determined that Mark could be substituted for Sean, given Sean's personal knowledge and involvement with the forensic materials and the report for this case.[3] Sean then signed his own expert declaration offering the same opinions as Mark and sat for a deposition.

---

[1] The Court refers to the Lantermans by their first names in the interests of clarity.

[2] Sean stated that, as a peer reviewer in this case, he had independently analyzed the digital evidence submitted, consistent with CFS's standard procedure. According to Sean, the peer review process involved creating forensic copies of the source material, which was then analyzed by a lead analyst and also by two additional analysts—those three individuals would then compare their independently obtained results and work together to ensure that the final content of the report was complete and factually accurate. ECF No. 273–3 (Sean Lanterman Decl., Mar. 28, 2025).

[3] *See* ECF Nos. 227 (order noting Mark's withdrawal and finding moot the motion to strike Mark's declaration), 251 (order granting leave to substitute).

CASE NO. 3:23cv22130-MCR-ZCB

Sean's expert declaration outlines his qualifications in Section I.[4]    He

described the materials he considered in Section II and summarized his opinions in

Section III.  Sections IV through VII are labeled as his conclusions:  Adams emailed

Alliance documents to a non-Alliance email account (Section IV), Adams attached

a USB drive to her Alliance laptop (Section V), Williams sent Alliance Files to a

personal email account (Section VI), and Williams copied files to a USB drive

(Section VII).    In those sections, Sean described his observations and attached

exhibits listing the emails and file attachments that he concluded had been sent from

Alliance laptops to Adams and Williams's personal email accounts or copied to a

USB drive.  Sean stated generally that he examined two laptop computers that had

been assigned to Adams and Williams for use in connection with their jobs at

Alliance.  He first coordinated with Alliance to obtain the information necessary for

decryption of the Microsoft Bitlocker software, which is built into the operating

system, and then "created a forensic copy of the laptops' hard drives, preserving

their data and operating system."    ECF No. 273–4 at 6.    Sean explained that

---

[4]  Sean joined CFS in 2010.  He is a licensed attorney, certified as a physical analyst and forensic examiner, and has received digital forensics training from the SANS Institute.  He has been personally involved in over 2,000 matters involving digital evidence and also has conducted training sessions for attorneys on the acquisition and analysis of electronically stored information. His qualifications have not been challenged.

Microsoft Outlook saves emails in specific "container files" called an "offline storage table" and a "personal storage table." *Id.* at 8–9.

Based on his observation of the content of these container files, Sean determined that the user activity showed Adams had sent at least 37 emails to an outside email address between January 5, 2023, and her last day of work on May 19, 2023, and 18 of those emails had been deleted.[5] Sean provided two examples of those deleted emails—one titled "All" had included a file attachment consisting of a spreadsheet list 1,234 Alliance contacts and another, sent to the same address on May 18, 2023, included four file attachments that he said "appear to constitute drawings, project information, and cost quotes" for a specific Alliance customer or contact. ECF No. 273–4 at 9–10. Sean also analyzed Adams's laptop "for activity consistent with the access or copying of files to sources extrinsic to the laptop" and concluded that on May 18, 2023, she had attached a USB drive to her laptop. He could not determine, however, whether any files had been copied.[6]

---

[5] Adams sent emails to trudy@blueeggconsult.com.

[6] Sean explained in his declaration that the Windows operating system records the time when a USB is attached to or plugged into a computer, the make or model of the device, and its serial number but not the content of files stored on the USB.

CASE NO. 3:23cv22130-MCR-ZCB

Sean similarly examined email data on Williams's Alliance laptop and determined that he had also sent emails and attachments from his Alliance account to a personal account.[7]   Sean included a table summarizing information about the emails, which included subject lines referencing drawings, quotes, or pictures of layouts, and he provided a complete list of the emails and names of the attached files that Williams sent.   Sean noted one example in which Williams, while an Alliance employee, sent an email to his personal email account titled "quote" with a price quote attached for an Alliance client contact.   That email also had been forwarded to Adams at her Laundrylux email.

In addition, Sean concluded that on July 10, 2023, Williams had attached a USB drive to his Alliance laptop and, within a span of about 20 seconds, rapidly accessed a total of 3,712 files stored on the laptop.[8]   In Sean's opinion, this was indicative of content being copied from the laptop to the USB drive.   He explained that Windows includes a feature that updates the "last accessed time" to include when files are copied, which he said was activated on Williams's laptop.   Sean also

---

[7] Williams sent the emails to jclaywilliams1@gmail.com. [same here, should we remove this??]

[8] Sean also determined that two hours earlier, Williams had accessed his personal google account using a web browser and reviewed an email bearing the subject line "FW: Trudy List."  Sean could not determine the content of that email or identity of the sender because it had been accessed through the web browser.

CASE NO. 3:23cv22130-MCR-ZCB

examined a forensic copy of a USB drive that Williams produced in discovery.  He determined this was the same USB[9] that had been attached to Williams's laptop on July 10, 2023, and that this corroborated the copying activity he had noted as occurring on that date.  In a footnote, Sean stated that he compared the "hash values" on the files with those on the USB, which amounts to a "digital fingerprint," to determine that the files were duplicates.  ECF No. 273–4 at 18 n.9.  Sean further determined from the forensic image that the USB also had been attached to other computers on at least four subsequent occasions, with files accessed *en masse*, which in his opinion, was indicative that the Alliance files had been copied to unidentified computers as well.

During his deposition, Sean was asked about his methodology and any proprietary methods used to reach these conclusions.  He testified about one proprietary method they used at CFS,[10] but he could not recall whether any of CFS's proprietary methods were used to analyze the USB or laptops at issue. He commented that his use of CFS's own tools has tapered off with the availability of

---

[9] This was a SanDisk Cruzer Glide USB drive, bearing the serial number 03000412082922191623.

[10] The example he provided was a method used by CFS of intentionally corrupting a "container file," saying, "when you do that, the process of rebuilding it can sometimes gather additional remnants of things like deleted emails."  ECF No. 273–6 at 77 (Tr. at 75).

CASE NO. 3:23cv22130-MCR-ZCB

commercial tools. When asked what tools he used in this analysis, Sean listed four

different licensed forensic tools:

> The first one is FTK. That's an acronym for Forensic Toolkit. It is a
> tool that's developed by a company called AccessData. The second one
> is a tool called Forensic Explorer, and that's developed by a company
> called GetData. The third is a tool called USB Detective, and I don't
> remember who wrote or develops that one. And the fourth one is a tool
> called Axiom that's developed and sold by a company called Magnet
> Forensics.

ECF 273-6 at 79 (Tr. at 77). He did not reference any of these tools in his

declaration, and he provided nothing further about these tools in his deposition.

## II.    Discussion

Federal Rule of Civil Procedure 26 requires a written expert report to contain,

among other things, "a complete statement of all opinions the witness will express

and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). A party who

fails to provide information required under Rule 26(a) cannot use that information

or witness as evidence for a motion or at trial, "unless the failure was substantially

justified or is harmless." Fed. R. Civ. P. 37(c)(1). Rule 26's expert witness

disclosure rule is "designed to allow both sides in a case to prepare their cases

adequately and to prevent surprise, compliance with the requirements of Rule 26 is

not merely aspirational." *Reese v. Herbert*, 527 F.3d 1253, 1266 (11th Cir. 2008) (internal quotation omitted).

Moreover, Federal Rule of Evidence 702, as explained by *Daubert* and its progeny, governs the admissibility of expert testimony and defines the Court's discretionary gatekeeping role of ensuring that expert testimony is both reliable and relevant. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). Under Rule 702, an expert witness who is qualified may testify in the form of an opinion if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. More succinctly, the Eleventh Circuit describes this as a three-part determination of whether (1) the expert is qualified, (2) the methodology is sufficiently reliable under *Daubert* standards, and (3) the testimony "assists the trier of fact, through the application of scientific, technical, or specialized expertise, to

CASE NO. 3:23cv22130-MCR-ZCB

understand the evidence or determine a fact in issue." *Rink,* 400 F.3d at 1291–92 (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). The reliability inquiry under *Daubert* includes consideration of: (1) whether the expert's methodology has been, or is capable of, being tested; (2) whether the technique has withstood peer review or publication; (3) whether it has a known rate of error; and (4) "whether the technique has been generally accepted in the proper scientific community." *McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004) (citing *Daubert*, 509 U.S. at 593–94). Importantly, it is the expert's principles and methodology that must be carefully examined, not the expert's conclusions. *Id.* The party proffering the expert bears the burden to establish the proper foundation for the admission of the expert testimony by a preponderance of the evidence. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999).

Laundrylux argues that Sean's declaration and opinions must be excluded because they consist of conclusions only and thus his declaration fails to comply with Rule 26(a)(2)(B)(i) and fails to satisfy the reliability inquiry of *Daubert* necessary to satisfy Rule 702.[11] The Court declines to strike Sean's declaration for

---

[11] Laundrylux also argues that Sean's opinions suffer from bias based on his yet-undetermined compensation. Having considered the response, the Court is not convinced. Nevertheless, it is unnecessary to reach that argument.

noncompliance with Rule 26 but agrees with Laundrylux that the declaration does not satisfy Rule 702.

While Rule 37(c) gives a district court discretion to strike an expert witness if the expert disclosure does not satisfy Rule 26, courts have concluded that "[t]he proper remedy for deficient expert disclosures is to move for an order compelling a more detailed disclosure prior to the close of discovery;" and a deficient disclosure may be harmless where the opposing party did not seek any cure and "had the opportunity to highlight these deficiencies" in a deposition. *Rose v. Costco Wholesale Corp.*, No. 22-CV-23700, 2023 WL 4561046, at *1 (S.D. Fla. July 17, 2023) (citing *Griffith v. General Motors Corp.*, 303 F.3d 1276, 1283 (11th Cir. 2002) (affirming a decision not to strike an expert for non-compliance with Rule 26 where the moving party waited until after deposing the expert and after the close of discovery)). On the other hand, courts have also stated a deposition is insufficient to cure a Rule 26 violation, noting that the purpose of the disclosure "is to provide notice to opposing counsel—before the deposition—as to what the expert witness will testify," and stating that "this purpose would be completely undermined if parties were allowed to cure deficient reports with later deposition testimony." *Moore v. GNC, Holdings, Inc.*, No. 12-61703-CIV, 2014 WL 12684287, at *4 (S.D.

Fla. Jan. 24, 2014) (quoting *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008)).

Here, Sean's declaration disclosed a basis for his findings, albeit in conclusory terms. He stated that he conducted his own "independent analysis" and peer review, which consisted of making forensic images of the laptops, "preserving their data and operating systems," conducting a "complete examination of the laptops," reviewing email container files, and observing the computer activities that formed his conclusions. He also compared "hash values" on files. The disclosure thus included *some* basis for the opinions, and Laundrylux had the opportunity to highlight the deficiencies in a deposition, so the Court will not strike Sean's testimony based on a Rule 26 deficiency.

That said, the above-mentioned conclusory bases Sean offered to support his opinions are completely insufficient for purposes of Rule 702. Sean provided no explanation of his methodology or process beyond those general terms. Alliance argues that the CFS team used "forensically sound procedures" that are generally accepted under industry standards and consistent with recently issued guidance from the National Institute of Standards and Technology ("NIST") (ECF No. 176–24). But Alliance concedes that Sean did not purport to adhere to NIST methods. And a

review of his declaration shows that he did not even reference the 85-page NIST report nor did he directly address any of the methods or concerns it outlines. The NIST states that there is no single technique but "hundreds if not thousands of individual techniques that might be employed in a digital forensic examination." ECF No. 176–24 at 38.[12] It notes that there are several classes of analysis tools, several important considerations in evaluating results, and a technique must be shown to be fit for its purpose. *Id.* at 47–48. Moreover, the NIST states that while "[d]igital investigation techniques are based on established computer science methods and are reliable when used with knowledge of how a tool functions and its limitations," it also states that "[t]he complexity and rapid change within the field . . . introduce the possibility for incomplete analysis or for misunderstanding the meaning of artifacts." *Id.* at 60. Sean's failure to describe his own knowledge of how a tool functions, why he used a particular tool, its limitations, or even what methods or tools he used in anything more than general terms leaves the Court unable to compare his process with techniques that Alliance argues have been extensively studied and documented in peer-reviewed literature or to evaluate whether any principles or techniques he used were properly applied in this case.

---

[12] Page references are to the court-stamped ECF pages.

CASE NO. 3:23cv22130-MCR-ZCB

Even an expert relying solely on his professional experience and observations "must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Carrizosa v. Chiquita Brands Int'l, Inc.*, 47 F.4th 1278, 1322 (11th Cir. 2022) (emphasis in original) (quoting *United States v. Frazier*, 387 F.3d 1244, 1261 (2004)). Because Sean did not provide any such explanation, the Court and jury would be required to merely accept his word for it based on his qualifications—in other words, his conclusions are connected to the activity on the laptops and USB drive "only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). This is impermissible and cannot be accepted as reliable. *See Frazier*, 387 F.3d at 1261 (the gatekeeping function requires more than just "taking the expert's word for it"); *see generally Davis v. Lockheed Martin Corp.*, No. 24-10080,---F.4th--, 2026 WL 2167835, at *4 (11th Cir. July 28, 2026) (district court did not abuse its discretion in finding an expert opinion unreliable for providing an insufficient explanation for his methodology); *Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1329 (11th Cir. 2014) (noting where the basis for the opinion is "left unstated, it would be very difficult indeed for the district court (or for that

matter the jury) to make even an informed assessment, let alone to verify that the opinion was reliable" (internal quotation omitted)).

Assuming this lack of explanation could be cured by having the expert flesh out his methodology through a subsequent deposition, that was not done here. In his deposition, Sean recalled four commercially available forensic tools that he used for this analysis and stated the names of the companies that produced them. Beyond that, however, he provided no information about how these forensic tools work, whether they are standard in the industry, or how the Court could gauge whether he had reliably applied them in this instance. Thus, his deposition testimony is simply too little too late.[13]

Accordingly, Laundrylux's motion to strike the declaration of Alliance's expert witness, Sean Lanterman, and exclude his testimony from trial, ECF No. 273, is **GRANTED**.

**DONE AND ORDERED** this 9th day of August 2026.

_M. Casey Rodgers_
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

---

[13] Notably, because Mark's declaration had previously been challenged on the same grounds, Alliance was well aware that methodology was at issue. Sean had the opportunity to provide his own report and to support his conclusions by explaining his methodology, yet he failed to do so.

CASE NO. 3:23cv22130-MCR-ZCB